## HAMILTON v. MENIFEE.

Where Buentello in his petition in 1832 represented to the Governor that he had twice before petitioned for the land and that he had occupied it for fifty years, &c., and the Ayuntamiento represented that he had settled and cultivated it since former years, and the petition also represented that the land lay without the Littoral Leagues,—and the Governor made the concession of said land or wherever else it might suit the petitioner, and directed the Commissioner, or in his default, or not being comprehended in any colonization contract, the first or only Alcalde of the respective municipality, to put him in possession, &c.,—and the Alcalde of Goliad, where the land lay, on the 28th July, 1833, put the petitioner in possession and issued the title, reciting that the land lay without the Littoral Leagues, and was not comprehended in any enterprize of colonization,—and Power & Hewitson, in 1831, upon being authorized to colonize the lands of the extinguished mission of Refugio, were required to receive as colonists whatever Mexican

families might present themselves, and especially those citizens of Goliad who had directed their petitions to the executive, but it did not appear that Buentello ever presented himself to the said Empresarios,—and afterwards when the line of the Littoral Leagues was run in 1834, the said land fell within that colony and consequently within the Littoral Leagues, and the said land was granted to one Carabahal as a colonist of said colony,—it was held that Buentello had such claim to the land as could neither be disputed nor resisted by the authorities of the colony ; that he had strong and irresistable equities ; that the Commissioner was bound to respect and regrant his title ; that the Court would consider that as having been done by the authorities of the colony, which should have been done ; that their attempts to convey the land to another, were nugatory, and if they had any, had no other effect than that of imposing on the second grantee the obligation to transfer whatever right, if any, was vested in her, to Buentello ; and that as the claim of the latter, to the land, could not have been disregarded by the colonial authorities, so neither can it be impugned by any one on the ground of the supposed nullity of the original title. (No weight was given to the fact that there was a "default" of a Commissioner, or no Commissioner for the colony, when the Alcalde acted.)

The establishment of the boundaries of a colony by its proper Surveyor, could have no effect on rights acquired anterior to that time ; its only effect is to support the rights acquired under it, in that colonial contract ; nor could it impair rights acquired adversely.

We are of opinion, therefore, that a variation of two or three miles from what may now be determined upon to be the exact line, (of the Littoral and Border Leagues,) should not defeat titles, if, when issued, they were supposed to be in conformity to the line, and which, on fair principles cannot be deemed to have been located or deeded in wanton disregard and in violation of the laws imposing restrictions on titles in the territory embraced by such line.

The Littoral Leagues are measured from the contact of the main land with the main sea, were no bay intervenes, and with the latter wherever one intervenes, and from the mouths of rivers, whether these be in the heads or lower down in the bays.

See this case for what is said respecting the establishment of the boundary of the twenty Border Leagues, by the General Government.

See this case for a discussion of the proper mode of ascertaining the interior line of the Littoral Leagues ; and for an expression of the opinion of the Court, upon the subject, in the absence of any authoritative establishment of such boundary by the former government.

Appeal from Goliad. Action of trespass to try title. The appellant, who was plaintiff in the Court below, deraigned title from Thomas Buentello. The defendants claimed by virtue of locations, and set up an outstanding title in Dolores Carabahal, or those claiming under her. The land was part of the lands which had belonged to the extinguished Mission of Refugio. The plaintiff having the oldest title, the ques-

tion was whether it was valid. That question was resolved into two, Whether the land lay within the ten Littoral Leagues, which were treated by the Court as coterminous with the colony of Power and Hewitson? and if, yea, Whether the grant to Buentello was not valid, notwithstanding it did not profess to have the special approbation of the Federal Executive and did not profess to be a title under Power & Hewitson.

It was proved by H. Bernard, a witness who was called by the defendants, and who was Surveyor of Goliad county, that he and A. H. Lea, Surveyor of Refugio district, had made a survey on the ground with great care ; that a radius of ten leagues from the upper or northern mouth of the Guadalupe, would not reach any part of the Buentello tract; but a radius of ten leagues from the head of Mission Bay would extend within said tract, and an arc therefrom would include about two thirds of the Buentello league; and a line from the star, (the end of the radius,) S. 48 or 49° * W., (the course of Richardson's line would appear to be S. 51° W.) would include about three fourths of that league within the coast leagues, if thus surveyed. (These radii were run about N. 65° W.) Witness said, he had extended, (by request,) a line of ten leagues from the mouth of the Guadalupe N. 45* W., as accurately as may be by such mapping, (Richardson's perpendicular would appear to be N 39° W.,) which can only be by approximation. From the outer terminus of this line, a course S. 48° or 49° * W. would leave nearly or quite the whole of the Buentello league within the coast leagues, if thus surveyed.

S. A. White, a witness for the defendant, also, stated that he was appointed, verbally, by Jose Jesus Vidauri, who was the Commissioner of Power & Hewitson's colony, one of the surveyors of that colony ; and as such was instructed, verbally, by said Commissioner, to run the upper boundary of that colony, by running ten leagues up the Guadalupe river, and the same distance up the Nueces river, from the mouth of each

* See S. A. White's testimony.

river, and then run a straight line between the upper points on the rivers, so ascertained. Witness executed the instructions, running ten leagues up each river, from the mouth of each, beginning on the line of the Guadalupe at its lower or western mouth, not then having satisfactory information of its upper mouth, and then running a random line to ascertain the bearing of the upper points so ascertained on the rivers; and then running a direct line between those points. The surveys aforesaid were actually and carefully made. The direct line thus run is above the improvements of the defendants, and leaves nearly all the Buentello league below it; all except a triangle at the northwest corner, perhaps three hundred yards on the river side and six hundred on the western side. The line up the Guadalupe was reduced to a course very near N. 45° W., and the cross line or upper boundary for the colony was, from the Guadalupe to the Nueces, about S. 48° 30' W. Witness, not having his field notes present, could not state the course more precisely. He run the colonial boundary, as aforesaid, in 1834. The boundaries of the territory of the original contract for Power & Hewitson's colony, were never surveyed, as witness believes, and no upper corner for the territory on the Guadalupe ever established, except by the terms of the contract, and the survey of the colonial line, as aforesaid, on the west of that river. When witness, as the Colonial Surveyor, at one time attempted to survey east of that river, he was prevented by a son of Martin de Leon, who claimed that territory as belonging to his colony. By beginning at the terminus of the line of ten leagues from the coast, as run by witness Bernard, and running parallel with the colonial line, as run by this witness, the points struck on the rivers would be different from those struck by the colonial line, as run by this witness.

There was no testimony in the case respecting Richardson's survey.

The Court appears to have taken judicial notice of it.

The plaintiff requested the Judge to charge the jury:

1st. If the jury believe, from the evidence, that settlement upon the land in controversy was made by Thomas Buentello, prior to the date of the colonial contract, then he was there by authority of law and the Empresarios were bound by the stipulations of their contract to respect the same.

2nd. If the jury believe from the evidence, that the survey, made by S. A. White, was made by commencing on the west bank of the Guadalupe river at its western mouth, the survey was made without authority and in violation of the contract and concludes no one.

3rd. If the jury believe from the evidence, that the grant is more than ten leagues from the mouth of the Guadalupe river, (designated in the contract as the beginning point,) then the Executive of Coahuila and Texas had the right to make the grant.

4th. If the jury believe from the evidence, that the grant is within the ten coast leagues, and that Thomas Buentello had settled upon the same prior to the date of the colonial contract, the grant is legal.

These instructions were refused. The Judge charged the jury as follows:

1st. If the jury believe from the evidence, that the land in question lies entirely within the colony contract of Power & Hewitson, the title to the plaintiff would be void, and you should find for the defendant.

2nd. If you believe that the defendants are in possession of the land set forth in plaintiff's petition, and outside of the colony contract, you should find for the plaintiff.

Verdict and judgment for defendants. This statement must be read in connection with the facts stated in the opinion of the Court.

*Phillips & Phillips*, for appellant. I. The only pretence that the plaintiff's title was void, was founded on the attempted proof and argument, that it conflicted with Power & Hewitson's colony. To show this, the defendant had introduced

the contract for that colony, and proved by that contract, that Power & Hewitson had no right to extend their boundary more than ten leagues in a straight line from the eastern mouth of the Guadalupe river. Having shown this by the contract itself, which expressly stated "ten leagues and no more," the defendant next proved by Bernard, his own witness and his own Surveyor, and by his own plot, that the tract of land in controversy, was between two and three miles more than ten leagues from the eastern mouth of the Guadalupe river, and consequently did not conflict with Power & Hewitson's colony.

Here it would seem the whole controversy ought to have ended. They had falsified their pleas by their own evidence and witness. Thus far our title was unimpeached not only, but confirmed in its validity, if need be, by their own examinations. Why then did the Court refuse to give the third instruction? The power of the Executive of Coahuila and Texas, to make grants of land outside of the ten littoral and twenty frontier leagues, is a matter of public notoriety, and under the law as well as the decisions of this Court, the Judge in the Court below, was bound to recognize that authority. Then why refuse the instruction? If the land claimed by the plaintiff was more than ten leagues in a straight line, from the beginning point of Power & Hewitson's survey, much more was it "more than ten leagues" from the Gulf of Mexico, where under the General Colonization Law, the measurement of the coast leagues was to commence.

After the defendant had falsified his own pleas, as we have shown before, he then introduced one of his own counsel, S. A. White, and by him impeached the previous testimony that he had introduced. But this particular witness testified, not that the line was run according to the contract of Power & Hewitson, but that it had been run in violation of that contract; not under its guidance but under the usurped dictation of Vidauri; not ten leagues from the eastern mouth of the Guadalupe river, but from some other place not designated as a beginning point for the survey. As an official survey, this

was by no means established. As such it was a palpable fail-ure, for many and manifest reasons, and could not be conclu-sive. 1. The entire survey of the colony lines was never made by White. The lines of the first contract were never run. This was necessary in order to establish the beginning corner of the second or augmentation contract. 2. The lines, actually run, were run in contravention of the contract: beginning at the wrong mouth of the river Guadalupe. 3. The lines as run were run in October, 1834, after the date of the plaintiff's title. 4. The act of survey was ministerial and not judicial. 5. The lines as run were run *ex parte* and if binding at all, would bind Power & Hewitson, and those claiming under them, but none claiming adversely to them. This principle is too familiar to need illustration or authority to support it. To claim then that this survey made by S. A. White, in the manner as stated, is conclusive, and "must bind the world," is to claim for it more than the force of a judgment. A judg-ment binds only parties and privies. A judgment purporting to affect the rights of a third party without notice, is a nullity as to him. But if the erroneous act of a Surveyor, be thus potent, and can retroact and destroy previously acquired rights, as contended in the argument on the above facts, what must be the potency of the survey made by Bernard, which it is admitted was correctly made? Is this ministerial act likewise conclusive as a judgment? Then we say it proves White's survey to have been erroneous. But perhaps it will be con-tended that the latter is more ancient, and that time has cured its defects. Then the argument proves too much, for it would give precedence to the survey made by G. W. Cash, which is the most ancient of the three. And if any survey is conclu-sive, why not the one made first in time, and by order of the Governor of the State, under the directions of the political authorities?

It is sincerely believed that the conclusiveness of White's survey cannot be successfully maintained. The argument is fallacious from beginning to end. If of any force at all, it

would equally prove the conclusiveness of the first and last surveys, and these show the incorrectness of the one it is attempted to support. And yet this is the survey that influenced the Court below, to refuse the third instruction asked for by the plaintiff. It was not that the Buentello tract, or any part of it lay within " a zone," ten leagues, from the mouth of the river; nor that it was within ten leagues from the Gulf of Mexico. Nor was it that the land lay in truth and in fact, within the colony contract; but it was simply and solely because White, in October, 1834, had, in his way, run a line, so that the greater portion of the land was included between that line and the Bay. And so it is contended that the arbitrary act of a ministerial officer, overrides a grant made by the executive of the State to one of her own citizens, in view of the most meritorious services, rendered during half a century! We think the Court was mistaken as to the conclusiveness of White's survey against Buentello, who claimed adversely thereto, and consequently erred in refusing the instruction. In this connection we will call the attention of the Court to the Richardson line, which is the county line, and which was run by him as the true line of the colony, in accordance with the contract. By reference to the plat, it will be seen that it falls below Bernard's line.

II. The Court erred in the instructions given.

The first instruction is objectionable on three grounds: 1st. It submitted a question of law to the jury;

2nd. It asserted that the grant to Buentello would be void if any portion of the land was within the colony contract of Power & Hewitson:

3rd. It misled the jury.

1. The question what land was within the colony contract of Power & Hewitson, was a mixed question of law and fact. It was for the Court to construe the contract, and to instruct the jury as to the survey it authorized ; and it was for the jury to determine if such authorized survey had been made. But the instruction left the jury to construe the contract for them-

selves and to apply the facts to their own notions of its legal import.

2. It asserted the principle that a grant that was void in part, was void altogether.

3. The instruction misled the jury. It misled them as to their own sphere of duty as jurors, as already stated. It misled them as to their right to find in part for the plaintiff and in part for the defendant. It misled them moreover in charging them on a supposed state of facts which did not exist, as all the proof showed; for there was no evidence that in any manner conduced to show that the entire Buentello tract was within the colony contract.

But the full extent to which this instruction misled the jury can only be estimated when considered in connection with the argument of counsel, that seemed to dictate it. To that argument we have before alluded, but in this connection it deserves a more extended notice. It was gravely contended that the line as run by White, though not the true line, could not be inquired into in this suit; and that if it had been leagues above, or leagues below the true line, as designated by the contract, it was still the colony line; that the principle applicable to surveys calling for natural boundaries, was applicable in this case; whether more or less land was included, it was still valid and conclusive upon all, and could not be inquired into by any. This was urged before the jury as the law of the case, in the presence of the Court, and with his seeming approbation. The instruction seems to have been given in conformity with these views. The jury were thus led to consider White's " approximation " line as their only guide in the decision of the cause, and hence, under the instruction of the Court, were forced to give an entire verdict for the defendant.

But again it is manifest from the instructions given that the Court altogether misapprehended the law of the case. He seems to have considered Power & Hewitson's " colony contract" identical with the " ten Littoral Leagues." Hence in

his view, a grant within the former was prohibited by the general Colonization Law, unless it emanated from the contractors, or had the direct sanction of the Executive of the Union. But the prohibition in the law relates to the " Gulf of Mexico " as one side of the territory, which is not to be settled except on certain conditions. The law makes no reference whatever to the " mouths of rivers " that may enter into the bays as the boundary limits.

If then Buentello had a settlement on the land in controversy prior to Power's contract; (and the testimony shows that he had,) and that settlement was not within ten leagues of the " Gulf of Mexico," but yet inside of the contract lines, the Governor had a right to make the grant, notwithstanding the contract. The contract itself made it obligatory upon the contractors to respect settlements within their limits :. and titles to these if not within ten leagues of the Gulf of Mexico, did not require the approbation of the Executive of the Union; nor were the parties so situated in any manner dependent on the contractors, either for the security or perfection of their rights. Not being colonists introduced by the contractors, they were instructed to apply to the Ayuntamiento of the nearest municipality for their titles, whose reports on their petitions were required to be forwarded to the Executive of the State for his action. Those petitions were to be forwarded to the Executive of the Union, that asked for land within ten leagues of the Gulf of Mexico. The consent of the contractors to settlements made within their limits subsequent to the date of their contract, was, it is true, necessary to a valid claim; but that consent was not necessary to such as were made prior to the date of their contracts. It was their duty to respect these not only, but to issue them their titles on application for that purpose.

In the case of Buentello, the order of the Governor was, that if the land fell within a colony, the Commissioner of that colony should put him in possession; but that in default of Commissioner the nearest Alcalde should put him in possession. So that, even if the land had been in truth within the colony,

as there was no Commissioner there till 1834, the title signed by the Alcalde was in all respects regular. So we see that the instructions of the Court were altogether erroneous, in view of the facts and the law of the case. He based the plaintiff's right to recover entirely on the fact that the land was outside of the colony, and by not charging on the legal import of the contract as to the manner the survey should be made, fully indorsed the argument, that the line run by White was conclusive, and so the jury understood him.

III. If we are correct in the views here maintained, then there can be no doubt as to the truth of the last assignment of error, that the verdict is contrary to law and evidence.

*J. F. McKenney*, also, for appellant. I. Before proceeding to examine the boundaries of the Littoral Leagues, or the colonial bondary, it is proper here to state, that we deny that the land in controversy, or any part thereof, is situated within the Littoral Leagues, or the colonial contract, if the survey of the same be legally and correctly made. But, for the sake of the argument, we will admit that the land is within the Littoral Leagues, and within the colony. It has been shown that Thomas Buentello was in possession of the land a long time before the survey of the colonial boundary. Defendant's own witness, White, states that in 1834, when he surveyed the colony, Thomas Buentello's rancho had the appearance of an old rancho, and it has also been shown that Thomas Buentello obtained a perfect grant for said land from the proper authorities of Coahuila and Texas long before the survey of said colony, and before any other title had issued to said land.

By virtue of the contract between Power & Hewitson and Coahuila and Texas, in 1828, all the vacant lands within the limits of the colony were appropriated with certain reservations; and amongst those reservations was the following:

Art. 3rd.—"All possessions under corresponding titles, which "are situated within the limits defined in Article 1st, shall be "respected by the colonists of the contract, the Empresarioo "being charged with the fulfilment of this obligation."

The government of Coahuila and Texas in conceding the Littoral Leagues to be colonized by the Empresarios, intended to reserve the lands in the possession of individuals within those limits; and this is evident from the language they use: "taking care that the ranchos or habitations of individuals "situated in both territories of DeLeon and Power be respect-"ed, as the Empresarios are bound to do in their respective "contracts."

But, suppose we admit the land to be within the colony, and defective for want of the consent of the Empresarios, then we submit that the defect is cured by decree No. 314, Art. 3rd, Laws of Coahuila and Texas:

"No change shall be made in any of the possessions that "should have been given with the consent of the Empresarios, "or without it, provided, that the express concession of the "Executive, and the other formalities the laws provide, shall "have preceded."

It is submitted, then, this decree was intended to meet just such a case as Thomas Buentello's, and we are confident when we refer to the instructions from the political authorities of Coahuila and Texas to the Alcalde of Goliad:

4th.—"The same Empresarios shall be bound to receive in "their colony whatever Mexican families may present them-"selves in the character of settlers, providing they possess the "necessary qualification; and, consequently, the citizens of "the village of Goliad, and others, who have presented peti-"tions for lands to this government, situated there, shall pre-"sent themselves to the aforesaid Commissioner, and shall be "received as such settlers, and be enumerated in the number "of families for which they have contracted."

Thomas Buentello had been a citizen of the village of Goliad, and had presented himself in the character of settler, and had petitioned the Executive of the State for this land; and these Empresarios were bound to receive and give him his title; but, as they failed to do so, this decree was intended to meet the case.

91

II. We will proceed to examine whether the land is within the Littoral Leagues or the colony. In order to ascertain the proper point to begin the measurement of the Littoral Leagues, we must consider the force and meaning of the language used in the law:

First Contract—Boundaries of Power & Hewitson's Colony.—"Begin at the angular point at which the river Guada-"lupe disembogues into the sea, upon its left bank; thence "following the line along the coast of the sea towards the east "to the point where the creek La Bacca disembogues; thence "upwards along the right bank of this creek, precisely ten "leagues distance, a line shall be run towards the west, par-"rallel with the coast, in a zone of ten leagues, to the river "Guadalupe; thence downwards, along the left bank of the "river, to the beginning point."

Augmentation Contract—Boundaries.—"Begin on the bank "of the Guadalupe river, where the former began; thence fol-"lowing a parallel line with the coast as far as the river "Nueces, as a boundary known between this State and that "of Tamaulipas; thence downwards, along the left bank of "the said river, to where it disembogues into the sea; thence "upwards, along the coast, to the disemboguing of the river "Guadalupe; and thence upwards, along the same river to "the point at which the survey began, which shall contain the "ten Littoral Leagues, precisely, and no more."

Art. 4th.—General Colonization Law.—"There shall not "be colonized any lands comprehended within twenty leagues "of the limits of any foreign nation, nor within ten leagues "of the coast, &c., &c.

Art. 7th—State Colonization Law.—"The government shall "take care that within twenty leagues bordering on the limits "of the United States of the North, and six leagues in a "straight line from the coast of the Gulf of Mexico, within "the limits of this State," &c., &c.

The word coast, or sea-coast, (as is generally used,) designates that region or tract of country bordering on the sea. It

is applied exclusively to main land pertinent and adjacent to the sea, connecting the low lands with the high lands, and is never used to mean land on an island, but in contradistinction to it. To say that the land on an island is coast, or sea-coast, would be an abuse of language in the sense in which the law uses it.

We believe the point to begin the survey of the Littoral Leagues is at the mouth of the river Guadalupe, where it disembogues into the sea, (sea meaning bay,) and we are supported in this view in the construction given to the law by all the officers of the National and State Governments, as well as from the Republic of Texas, from 1824 to this time, to begin at the mouths of the rivers on firm land. These were the instructions given to the Colonial Surveyor by the Commissioner, and also by the Republic of Texas to the Surveyor in running the county boundary of Refugio county. And this view was also taken by General Teran, in his correspondence with the Executive of the State of Coahuila and Texas, who was clothed with plenary powers, judicial and ministerial; and here we say the language of the law, and the action of the authorities of both governments, national and State, had fixed the point to begin the survey of the Littoral Leagues beyond doubt, and it is now no longer an open question; and especially if any respect is to be paid to the opinions and adjudications of those who at that day had the best opportunity to know what their laws meant, the matter is settled, and forever.

It has been contended that the interior lines of the Littoral Leagues and the interior line of the colony is not the same; we think differently—they are identical.

Having fixed, as we believe, the beginning point, we come now to examine whether the survey has been made correctly, and in accordance with the law and the views heretofore entertained.

Three different surveys, at different times, and by different persons have been made of the "ten Littoral Leagues," and all three surveys different from each other.

White, witness for defendant, says, in 1834, he surveyed the colony, under verbal instructions from the Commissioner Vidauri. He began on the west bank of the river Guadalupe, at its mouth, and ran up said river ten leagues; then went to the mouth of the Nueces river, and ran up that ten leagues, and then connected the two points on said rivers. White's survey was not legally and correctly made according to the terms of the contract. He began at the wrong place on the wrong side of the river, and must end at the wrong place. White stated that the survey of the first contract had never been made. The beginning point of the augmentation contract was the third call of the first contract, and it is submitted that, until that point had been established, by an actual survey of the first contract, no survey of the augmentation contract could have been made. Therefore, inasmuch as the survey of the augmentation contract depended upon the actual survey of the first contract, and as that had not been done, and as they are two distinct surveys, one calling for the other, it is a mathematical impossibility to connect the two surveys together without a beginning point.

We come now to the line as surveyed by Richardson, for the boundary of Refugio county; which, we suppose, the Court will notice judicially. Of the mode and manner of making that survey, we know nothing but what appears from the map. Richardson was directed to be governed in his survey by the boundaries of the colony of Power & Hewitson. The map shows this line to be several miles below the land in controversy. And therefore the authorities of the Republic of Texas have shown the land to be out of the colony.

The survey made by Barnard and Lea was made for the purpose of evidence in this suit, and it is believed that it was carefully made. It will be seen from the map exhibited, this survey fixes the point of the "ten leagues" on the San Antonio river, about equidistant between the other two surveys, measuring from the mouth of the river Guadalupe, which survey does not touch the land in controversy.

In order that the Empresarios Power & Hewitson might be enabled to survey the colony, three points were given (natural calls.) The "mouth" of the Guadalupe river, the "mouth" of the Lavaca creek, a "point" on the Lavaca creek, "precisely" ten leagues in a straight line from its mouth, so as to include a zone or belt of ten leagues. It is submitted that the proper plan, and that which was intended, is to connect these four given points together on the two rivers, by two parallel straight lines, so as to form a "zone" or belt; and this was evidently the manner they intended the survey to be made, from the language used; for in no other way can the survey be made so as to form a zone, which is a geographical term and means a belt of country of equal and uniform width. It was never intended, nor is it practicable to run the interior line parallel with the sinuosities and curvatures of the bay or coast. And again, as a general thing, a straight line connecting the mouths of the rivers on an average, divides equally the land and water, and it is submitted that this view was taken when the law was made, and especially when we remember how abundant lands were at that day, and how few settlers to occupy them; lands were no object, but settlers were. If, then, we are correct in the manner of making the survey, then there can be no doubt but the land is out of the colony, and, therefore out of the Littoral Leagues.

It has been contended by some, that the measurement of the ten Littoral Leagues must begin on the shore of the Gulf of Mexico, on St. Joseph's Island; and this has lately been decided by the U. S. District Court, now in session at this place, (Manuel Savarago and wife v. John F. McKenney,) that the proper place to begin the measurement of the Littoral Leagues is on the outer shore of St. Joseph's Island, measuring the width of the island and adding it to the main-land, deducting the water between the said island and the main-land; in other words, removing the island up to the main-land; and, certainly, great weight is due to the decision of that Honorable Court. And should this Court co-incide in that opinion, then

there can be no doubt but that we are still farther from the forbidden ground, and our title is perfect, beyond all doubt, for we have shown when we are out of the Littoral Leagues, we are also out of the colony, for they are precisely identical, as far as it is in the power of language to make them identical.

It says the contract shall contain the ten Littoral Leagues, precisely, and no more. Each begins where the other does, and end where the other does; and each contains precisely the same land and boundaries. And so thought the authorities of Coahuila and Texas; and no contortion or distortion of language can make it mean any thing else.

From an examination of the surveys aforesaid, in attempting to establish this colony, and seeing how widely they differ from each other, and when we contemplate the great difficulty and practicability of finding a line precisely ten leagues from the coast in the interior, and the utter impossibility of extending a line from that point west parallel with the meanderings, sinuosities, and curvatures of the coast, we must be satisfied that the most that can be attained by any survey, is an approximation, and we are forced to conclude that the only true, proper and correct mode is, to connect the four given points, as before indicated, by straight lines, so as to form a zone, which is the only plan at all practicable, and by which we can arrive at truth; and this is certainly what was intended in the beginning, for we cannot presume the law would require that to be done which could not be done.

From what has been said, it is evident the verdict is contrary to law and evidence, and for that reason the jugment of the Court below should be reversed.

*P. Lea*, for appellees. Without details—the record presents two principal objections to the grant made to Thomas Buentello.

1st. It was from the Alcalde of Goliad, but for land within the colony of Power & Hewitson.

2nd. It was for land within the Littoral Leagues, but had not the approval of the National Executive.

I. Plaintiff claims that settlement by Thomas Buentello gave him a right, of which the concession and testimonio were a confirmation.

By petition dated June 23rd, 1832, it appears that he was " a native and resident of the village of Goliad," and that, at some time not stated, he had made use of the place claimed, and had improved it, yet he had not settled there.

But, settlement at the place would not have brought him within the third article of the colonial contract. It reads thus : " All possessions under corresponding titles, which are situat- " ed within the limits defined in Art. 1., shall be respected by " the colonists of this contract, the Empresarios being charg- " ed with the fulfilment of this obligation." This contract was made June 11th, 1828, and expired June 11th, 1834. (Record p. 45, 46, 47.) During the continuance of this con-tract, on the 23d of June, 1832, the petition for title was pre-sented. Of course, the possession, (whatever it may have been,) had no corresponding title at that time, and the phrase " corresponding title," by its own force, means " legal title," and analogy sustains this construction, for the phrase " legal titles " is used in similar provisions of the colonial contracts of Austin. (1 White's R. 611, 617.)

Mere possessions have not been respected as rights, by which property could be held, under any contract or administration. " Corresponding titles" or " legal titles " were essential under the contract to secure respect for the possessions.

The personal merit of the grantee is fully conceded, and there is no doubt, that he might have obtained title to the land, if he had made application within the colony. This record does not show all the documents, connected with this colonial contract; but those documents, legally authenticated, have been extensively circulated, and are now history. One order of the Governor related expressly to the inhabitants of Goliad, who had petitioned to him for concessions within that colony, and he directed that they should apply to the colonial author-ities, and be received as colonists. This grantee preferred a

Goliad title, and, also, a residence at that village, for it does not appear, that he left it during his life.

This is an effort to antedate the grantee's right, by throwing it back on mere possession. The contrary is declared in strong terms, by Article 9 of Decree No. 13 of Laws of Coahuila and Texas. Speaking of the Chief of Department of Texas, it says: " He shall take care that in his department no individual shall " appropriate to himself any land," &c. The principle of this early decree has been so often and so recently recognised by this Honorable Court, that the further investigation of plaintiff's title will refer to written documents, and not to questionable possession.

On the right assumed to make an independent grant within the bounds of a colonial contract, the law has been decided against the plaintiff by this Honorable Court in another case. (Mason v. Russell's heirs; 1 Tex. R.)

II. The grant was issued without the approbation of the National Executive, for land within the Littoral Leagues. Such previous approval is a fact to be proved on part of the claimant under the grant. (Edwards v. Davis' heirs, 3 Tex. R. 321; Republic v. Thorn, 3 Tex. R. 499; Goode v. McQueen, 3 Tex. R.)

What is the territory called " The Ten Littoral Leagues ?" The proposition is now submitted that this territory embraces every point within the distance of ten Mexican leagues, from the nearest part of the seashore, including the bays as parts of the sea.

In the first place, this proposition is sustained by the language of the laws. And some verbal criticism may be useful, not only to elicit truth, but also to detect error.

The Colonization Law of the General Government of Mexico, of 18th August, 1824, is the beginning of this subject. It may be found in Schmidt's Civil Law of Spain and Mexico, p. 340. An English translation is given as follows: " No " lands shall be colonized within twenty leagues of the bound- " aries of a foreign nation, nor within ten of the sea-shore,

" without the previous consent of the Supreme Executive
" power." The original Spanish also is given, from which it
appears that " diez litorales leguas " corresponds with " ten
leagues of the sea-shore." " Littoral," from etymology and
usage, is applied to the sea-shore, and not to any other shore.
It is a generic term, relative to the sea in its most enlarged
acceptation, when not specially applied to a particular part.
The Mexican country extended across the continent, between
the sea, called the Pacific ocean, on the west, and the sea,
called the Gulf of Mexico, on the east. Each of those seas
had numerous bays, which were integral parts of the whole.
The contact of the main land with the main sea, where no
bay intervened, and with the latter, where such existed, con-
stituted the only continuous line of sea-shore on the face of
nature. The national law extended to the whole country, and
applied the generic term "littoral" to the whole sea-shore.
Both the relative and the object were the most comprehensive.

The national law was the authority and necessary rule of
formation and construction for the State laws on the same
subject. Thus the State of Coahuila and Texas applied the
general law and principle to that part of the sea within its
jurisdiction, using the phrase, " ten littoral leagues upon the
coast of the Gulf of Mexico," in both the Colonial Decrees,
16 and 190.

By these laws, the State avowedly enforced the national law,
using the same relative word " littoral," and applying it to
the same and only sea-shore, " within the limits of the State."
But a recent argument and judicial decision have applied the
term " littoral" to the outer side of the islands, bordering the
State, as contradistinguished from the shore, which divides
the sea from the main-land ; and this distinction has been made
on the name " Gulf of Mexico," used in the State laws, as
quoted. On this distinction, it has been decided, that the
measurement of the Littoral Leagues must begin on the outer
border of the islands, (where there are any,) and be extended
by lines at right angles with the general course of that border,
92

to the distance of ten Mexican leagues inward, computing only the land of the islands and main-land, and not the intervening waters.

It is said that the word "Gulf," by force of the term itself, excludes the bays, and that this meaning is so plain and unequivocal, that there is no room for construction, out of the word itself.

This criticism may be met appropriately, in the first place, in its own way. "Gulf" has its peculiar representative in the Spanish "Golfo;" but this magical word is not the one used in the laws quoted. "Seno" is the Spanish word which is applied, with peculiar propriety, to the bosom or receptacle of waters, as contradistinguished from the main-land. If some particular part, called "Golfo," had been intended, that word would have been used in an exclusive sense; but the word "Seno" was preferred, as precluding such distinction, and comprehending all that part of the sea, which had received the English name "Gulf of Mexico," in its most enlarged acceptation. That meaning, by all political and judicial authorities, comprehends the bays as parts of the whole sea, by whatever name it may be called. The word, then, would seem to be exactly the reverse of the assumed restriction.

But if it is not intrinsically conclusive of the most enlarged sense, it may, at least, be open to the ordinary rules of construction.

Sea-shore, on the outer border of the islands, is a nonentity for parts of the distance, which is necessary to make one side of the territory, called the "Littoral Leagues." The spaces between the islands cannot be a sea-shore boundary; on the contrary, they are parts of the water by which we may attain to the only shore that can answer for a continuous border.

In defining the Littoral Leagues, we must have on one side a sea-shore, and that must be the dividing line between sea and land, which has been judicially defined, by highest authority, to be "the space between high and low water-marks of tide."

The sea-shore is likewise defined by the extent of maritime jurisdiction, and all authorities agree, that it extends over every arm of the sea, to the shore of the main-land.

The object of the national law furnishes a rule of construction, not only for its own language, but also for that of the consequent State laws.

The object was to prevent settlements within ten leagues of the sea, without authority of the National Executive, as the peace and safety of the country might be otherwise compromised by approaches from the sea.   That object would be defeated by extending the given distance from the outer side of the islands, even without computing the water, and by any mode of measurement.  But the force of this principle will be more felt, when we come to apply it to the question of extension of the main-land shore.

The conceit of an island border is only the creature of criticism on the translated word " Gulf;" but no such word is found in the national law, by which the policy was declared as to settlements near the sea.  If the State had desired to modify this policy, it had no such power, but its laws expressly recognize the authority and policy of the fundamental law on which they stand.  The State laws, therefore, must be construed, as they were intended, to enforce the policy of the national law, and not to derogate from it.  But the restricted construction of the word " Gulf" violates the language and policy of the national law, and perverts the natural order of things, and makes a flagrant impropriety in all its bearings.

If there could be any doubt, on the language of the laws and the nature of the case, that the extension of the ten leagues should be from the main-land shore, that position has been established by uniform construction and practice.  Next August will be thirty years from the date of the national law, and the first State law on the same subject is dated the succeeding March.  The action of the public authorities, under these laws, by which the settlement of the country was regulated, has become important and interesting history.  A few

particulars will be noticed, according to a translated copy of documents in the General Land Office.

On this subject, the Governor of Coahuila and Texas gave instructions as early as 26th October, 1826, as follows : "As " to the point, at which the survey ought to commence, so as " to leave free the littoral lands, excepted by the law of colo- " nization of the 18th August, 1824, the measurement ought " to begin from the shore of the main-land, leaving thus the " sea, the lagunas having communication with it—since they " are considered a part of one whole—not so the lakes or " ponds, which are separated from the sea and surrounded on " all sides by the main-land."

A few years later, Gen. Teran was Commandant General and Inspector of the Internal States of the east of Mexico, and had plenary powers to represent the General Government, in all departments of its administration, in this quarter.　On the 30th of October, 1830, he inquired, of the Political Chief of Texas, for the judgment which he had formed of this matter. The Political Chief answered by a copy of the Governor's in- structions, as before quoted.　And Gen. Teran communicated the same instructions to the officers of his government, for their observance and enforcement.

So the official authorities of the General and State Govern- ments concurred expressly in adopting the main-land shore.

In harmony with this view, the Colonial contracts were made and executed.　(White's R. 613, 617.)

In these contracts the sea and the Gulf of Mexico are re- garded as identical, and as extending to the mouths of the rivers, which are natural objects called for on the shore of the main-land, from which the ten leagues must be extended in- ward.

Whatever might be said of the islands as incidental, they have never been regarded as influencing, in any respect, the extent of the Littoral Leagues, from the main-land shore.

Even the Commissioner of Power & Hewitson's colony, (although he granted parts of the islands,) never pretended

that they controlled the inland extent of the Littoral Leagues. On the contrary, he directed the Colonial Surveyor of that colony, which called for the ten Littoral Leagues precisely, and no more, to survey from the mouths of the rivers, and the corresponding shore, ten leagues on the main-land. (Record, p. 66, 67, 68.)

Moreover, it is matter of law and history that the line of Refugio county was to be run under instructions of the Commissioner of the General Land Office, on the same principle, which principle is not affected by the imperfection of its application.

From the beginning of any question as to the extent of the Littoral Leagues to the present time, during nearly thirty years, all the authorities that have acted on the subject, under the General Government of Mexico, and the State Government of Coahuila and Texas, and the separate government of Texas, have concurred in their construction and practice, (so far as is known,) regarding the excepted territory as extending ten leagues from the main-land shore. The people have acquiesced in this theory and practice, and their rights have been acquired accordingly.

In the further consideration of this case, the main-land shore will be regarded as the proper object, from which to compute the ten interior leagues. But the question occurs, how shall this computation be made? Various modes have been adopted in making colonial contracts, and in surveying under them, and minor inaccuracies may have occurred in both. But it is submitted, that no contract, nor mode of survey, can be correct for the Littoral Leagues, which allows a violation of the language and policy of the national law, and of the corresponding State laws on that subject. The word " colonized " is used in the national law, and " settlements " in the State laws. The restriction extends to every kind of settlement within the distance of ten leagues from the sea-shore. This regulation was positive and unqualified, not subject to any compromise nor evasion. The principle is mathematical,

to determine a succession of points, so as to make a continuous line, precisely ten leagues from the shore.  The scientific idea may be exhibited mechanically, on a map, by taking ten leagues within the dividers, and with that radius, from the heads of the prominent bays, describing arcs, to their mutual contacts.  Either side of such arcs would be in or out of the Littoral Leagues positively.  A practical line might be according to a contract, provided always, that it could not be within the supposed arcs, for a boundary of the Littoral Leagues. And any settlement within those arcs could not be otherwise than within the Littoral Leagues, and within the prohibition of the policy and laws on that subject.

Having ascertained a precise legal principle, it remains to give it application.  Under the laws themselves, no survey was ever made to ascertain a continuous boundary for the Littoral Leagues.  To this day, it remains only a potential line, to be ascertained in particular places, as occasion may require, by appropriate proof.  No general line was necessary.  No quantity of area was contemplated.  A local distance from the sea-shore was the only thing to be ascertained, and that could be accomplished in many ways.

It may be well, in deference to the popular idea of a lineal border, to show how a line might be run on the correct principle before stated.  As a precise parallel with the shore is impossible, and as a given distance from it is indispensable, we may adopt such practical right lines, as will correspond, as near as possible, with the curved shore, and yet include the reserved territory.

To be exact, the middle points of the supposed arcs, from the heads of the prominent bays, are stations in the survey, and those stations are simply connected by right lines.  Those stations could be fixed, with practical accuracy, either by running direct lines, or by calculation on other surveys, extending from the heads of the bays.  Thus a practical line might be extended with great facility, and inconvenience not be an apology for violating law.

The whole theoretic and practical idea may be simply stated thus : the heads of the prominent bays command the entrances of the intervening peninsulas.

An application of the principle, before stated, to the proof, would leave no doubt that the whole or nearly all of the Buentello tract would be within the Littoral Leagues.

This Honorable Court and the Supreme Court of the United States have decided that any grant, or other contract, is wholly void, which impugnes public policy, however declared. (Hunt's heirs v. Robinson's heirs, 1 Tex. R. 748 ; Kumet *et al.* v. Chambers, 14 How. 38.)

HEMPHILL, CH. J.   This case presents several questions of importance.   The want of time, however, forbids the discussion of any but the most essential.

The plaintiff relies upon a concession to Thomas Buentello. It appears from the title of Buentello, that on the 23rd June, 1832, he petitioned the Governor of the State for a grant of the land in question, representing to his Excellency, that in former years he had addressed two petitions to the Executive to the same effect, but that they had not been acted upon ; that the land lies without the Littoral Leagues ; that he has cultivated the same, and built a house thereon in good faith ; that he has sustained the frontier with arms in his hands, repelling the incursions of the barbarous Indians, for fifty-six years.   He prays that he may be put in possession of said land, and have the privilege conceded in the 12th Article of Decree No. 128.

The Ayuntamiento of Goliad sustains his petition, by a report of the same date, stating that he had settled and cultivated since former years.

The Executive, by decree of the 29th of April, 1833, concedes the league, in the place solicited or in the place that may be most suitable, and directs the Commissioner for the partition of lands to which the land solicited may pertain, and in his default, or not being comprehended in any colonization

contract whatever, the first or only Alcalde of the respective municipality, will put him in possession of the land and issue the corresponding title.

This concession having been presented to the Alcalde of Goliad on the 28th July, 1833, he decreed that in consequence of the designated land having been declared vacant by law No. 177, and not pertaining to any person or corporation whatever, nor to any enterprize of colonization, and finding it without the Littoral Leagues and within the limits of the jurisdiction of the municipality, he, by virtue of the commission conferred on the Alcalde of the village by order of the 25th June, 1831, did order the land to be surveyed by the scientific Surveyor George W. Cash. The field notes being returned, the said Alcalde, by virtue of his commission as aforesaid, did on the 4th August, 1833, issue a title of possession to the grantee, in form, having the legal requisites and the grants of right usually expressed in such titles.

This title is perfect in itself; and, considered alone, its validity cannot be questioned.

But it is objected, that notwithstanding it was the opinion of the grantee and of the Alcalde of Goliad, that the land lay without, yet that it was in fact within the Littoral Leagues, and within the colonial contract of Power & Hewitson ; and that the titles, wanting the assent of the Federal Executive, was void, and will not support the action.

As a general rule, it is admitted, and it has been repeatedly decided by this Court, that a grant, under the authorities of the State of Coahuila and Texas, for land in the border or Littoral Leagues, must, to be valid, have the assent of the Federal Executive ; and that without proof of such assent, it will not, in an action to try title, authorize a recovery for plaintiff. But it is urged on the other hand, that this rule has no impairing efficacy on the title in this case ; that if it were admitted that the land lay within the coast leagues and the authorities passing the title were mistaken in their judgment that it lay without, yet the right of the grantee, to the land, cannot

be impeached; that although it has not the direct, yet it has the virtual assent of the general government; that the authorities of the colony were bound to respect the grant, and if necessary, to issue a new title to the grantee; and that the regrant of the land to Dona Dolores Carabajal, was in violation of law, in derogation of the legal rights of Buentello, and in the exercise of an usurped and not a legitimate authority.

The facts upon which the superiority of Buentello's claim to the land, over any other, is asserted, are found, some of them, in the record, and some in the contract of Power & Hewitson, though they do not appear in the mutilated copy of the contract, in this record. This land was a portion of the extensive tract once belonging to the mission of Refugio. On the 21st April, 1830, the Empresario Power represented to the Executive, that a portion of the lands of the mission lay within the limits of his colonial contract, and he requested certain declarations and proceedings to be had, in relation to said lands, to which the Executive replied on the same day; but it is not necessary to notice particularly the substance of the application or the response. On the 26th April, 1831, the Executive was by decree No. 177, p. 181, L. & D., authorized to alienate the lands pertaining to the extinguished missions, and for the better administration of that law, he issued instructions, the fifth Article of which declares in effect, that the Empresarios having contracted to receive in their contract whatever Mexican families may present themselves in the character of settlers, and having the necessary qualifications, consequently the citizens of the village of Goliad, who had directed to the Executive petitions for land in that point, should present themselves to the said Empresarios, and should be received as settlers, and counted in the number of families for which they have contracted.

It appears, then, that a portion of the lands of the mission lay within, and portion without the limits of the colony; that for those lands within the colony, applications had been made to the Executive, for grants, by the citizens of Goliad; and

93

the effect of the instruction is to require the Empresarios to receive and treat them as colonists lawfully introduced into their contract. 'At the date of this instruction, the boundaries of the colony were not defined; nor was the upper line run, until October, 1834, three years and five months subsequent, and fourteen months after the date of the title to Buentello. There is no direct evidence, it is true, that Buentello had made his application before May, 1831; but there is what is equivalent, a recital in his petition of the 23rd June, 1832, that he had in former years addressed two applications to the Executive. When the line was run in 1834, and when the Empresarios found that it extended above what had been supposed by the authorities of Goliad the true boundary of the coast leagues, they found also within this disputed territory, the grantee Buentello, who was a citizen of Goliad, one who had addressed petitions for land to the Executive within the limits of the mission tract; who had built houses and long settled and cultivated his land; who had for fifty-six years struggled with all the calamities and horrors of a frontier infested by hostile savages; and to whom, in the full confidence that the land lay beyond the Littoral Leagues, a complete title had been granted by the competent authorities. They found also, that the concession of the Executive, upon which the final title was issued, required the Commissioner of the colony in which the land was situate, to issue title to Buentello. What, under the circumstances, was the duty of the Empresarios and Commissioner? and what was the right of the grantee? Unquestionably to respect the claim of Buentello to the land; to receive him into the number of their families, and re-issue the title, or ratify the one already issued. He was one of the Mexican citizens provided for by the instruction; and in addition, his concession required the Commissioner to put him in possession and give title to his land. Had he received title, he could not have claimed to be an independent settler. The obligations and rights of the Empresarios and Commissioner were correlative. They were bound

to receive him and issue title, and he could not refuse to be classed as a colonist and thus deprive the Empresario of his corresponding premium. Had he been received as a colonist, he could not have been deprived of his land, nor could it have been lawfully granted to another. It is possible he may not have presented himself, nor asked admission as a colonist.

There is no evidence that he was alive at the time the boundary line was run. The presumption is to the contrary; his widow is proven to have been his wife in 1830, 1831, 1832 and 1833, but nothing is said about his being alive in 1834. It was not until October of that year, that this line was extended; nor was it until December, that the land was granted to another. And even this latter grant carries on its face such marks of fraudulent concealment, as would most probably prevent its coming to the knowledge of Buentello. The Senora Carabajal does not petition for this land. She prays for a renewed title to the lands granted to her deceased husband by the Alcalde of Goliad, under the supposition that it lay without the Littoral Leagues. The Commissioner adjudicates to the applicant the sitio of land which she claims, and proceeds to define the bounds by a survey lately made. All the proceedings in relation to this grant, except the survey, would induce the belief that Mrs. Carabajal was procuring a title for lands granted to her husband, and not for those deeded to Buentello. And had the latter been alive, he would most probably have had no notice of this invasion of his rights. But whether alive or not, whether he had notice or not, under all the circumstances, he had such claim to the land, as could neither be disputed nor resisted, by the authorities of the colony. He had strong and irresistible equities. The Commissioner was bound to respect and regrant his title. The Empresario was under obligation to receive him as a colonist; and the Empresario's right and duty to enumerate him as such, and receive the corresponding premium, could be disputed by none. And on a familiar principle of equity, we will consider that as having been done by the authorities of the colony,

which should have been done; that their attempts to convey the land to another, are nugatory; and if they have any, have no other effect than that of imposing on the second grantee the obligation to transfer whatever right, if any, was vested in her, to Buentello, the original and rightful claimant of the land. And as the claim of the latter, to the land, could not have been disregarded by the colonial authorities, so neither can it be impugned by any one on the ground of the supposed nullity of the original title.

Such we deem to be the rights of Buentello, if it were admitted that the lands lay within the Littoral Leagues. But this is by no means free from doubt. It seems that the authorities of the municipality of Goliad, the Surveyor Cash, and the grantee, himself, were confident that it was without the coast leagues. There is no evidence, that at the date of the grant of this title, the Empresarios claimed that the boundaries of their colony extended beyond this tract of land. Their line was not run for more than a year posterior to this grant. This line could have no effect on rights acquired anterior to its extension. Its only effect is to support rights acquired under it, in this contract. It cannot impair those acquired adversely or of an antecedent date.

Besides, it appears that no two surveyors can agree upon the proper locality of this boundary. The County Surveyor of Refugio, or his Deputy, Mr. Richardson, (an accomplished mathematician and scientific surveyor,) established this boundary some miles below the line traced by Mr. White, the Surveyor of the Colony, and below almost the whole of the Buentello league. This survey was made between 1838 and 1841, and its correctness was then, and has ever since been, recognized by the authorities of the country. It was established in order to fix the county boundary of Refugio, and it continues to be the divisional line between the counties of Goliad and Refugio to this day.

Here are two surveys, entirely disagreeing with each other. If surveyed in one mode, the land of Buentello would be left

almost wholly within, if in the other, almost wholly without, the Littoral Leagues.  The surveys of Bernard show that the land is more than ten leagues from the mouth of the Guadalupe, though the whole of it is not so far from the head of Mission Bay, which projects into the land some short distance above the mouth of the Guadalupe, but is not within the limits of this colonial contract.  He also testifies that by extending a line by mapping ten leagues from the mouth of the Guadalupe N. 45° W., from the outer terminus a line running S. 48° or 49° W. would leave nearly or quite the whole of this tract within the coast leagues.  But this proves nothing.  He did not actually run such line, nor ascertain whether such lines should be N. 45° W., or S. 48° or 49° W.  These discordant surveys show the inherent difficulty in tracing the interior line of the coast leagues, and the danger to which titles would be exposed by fixing, after the lapse of twenty years from the grants, any specific line as the unvarying boundary by which titles must stand or fall.  The restriction on colonization within the border and coast leagues was established for political purposes.  But no line was traced by either the General or State Goverments, accurately defining the boundaries of the reservation.  Under such circumstances, the line was ascertained in various ways, by the authorities invested with the granting power, in territory adjacent to the boundary ; and in conformity to these lines, numerous titles were granted, and rights to lands acquired.  It would be an act of great injustice to permit titles fairly and honestly granted, with reference to a line of boundary, not traced by the Government, but honestly determined upon by the authorities, on the best lights which they had on the subject, to be now impeached, because they are two or three miles within or without what may now be supposed to be the exact line.  Exactness was difficult of attainment and should not be insisted upon, to the destruction of right.  We are of opinion, therefore, that a variation of two or three miles from what may now be determined upon to be the exact line, should not defeat titles, if, when issued, they

were supposed to be in conformity to the line, and which, on fair principles, cannot be deemed to have been located or deeded in wanton disregard and in violation of the laws, imposing restrictions on titles in the territory embraced by such line.

On these principles, the title of Buentello must be held good, whether it be a few miles within or without the true boundary. It was supposed by the granting authorities to be without the boundary. No line had been run at the time of the grant, although eight years had elapsed from the Colonization Law. And whether this land be within or without the real boundary, is a matter not yet ascertained. So far as authoritative surveys go, one places it within, and the other without the line; and this latter has long had, and still has, the sanction of the public authorities of the country. The title of Buentello was also prior in point of time, no colonial claim or grant for the land having then been made or issued. The question of the proper mode of defining the interior boundary of the ten coast leagues has been discussed with earnestness and ability, and we will proceed with all possible brevity, to express our views on that subject.

The fourth Article of the national Colonization Law of the 18th August, 1824, declares, that there cannot be colonized any lands comprehended within twenty leagues of the limits of any foreign nation, nor within ten leagues of the coast, without the previous approbation of the Supreme Executive Power. The seventh Article of the State Colonization Law is to the effect, that the Government shall take care that within twenty leagues bordering on the limits of the United States, of the North, and ten Littoral Leagues upon the coast of the Gulf of Mexico, within the limits of the State, no other settlements shall be made than such as shall meet the approbation of the Executive of the Union, &c., &c. In the translation of this Article of the State Law, as published by Stephen F. Austin, in 1829, the expression is ten leagues, in a straight line from the coast of the Gulf of Mexico. But there is nothing in the original, corresponding to "straight line," in the

English; and ten Littoral Leagues upon the coast of the Mexican Gulf, is the literal translation of the terms used in the original.

In the first place, then, what is the coast, from which the ten leagues are to be measured? What was and is geneaally understood by the term coast? The counsel of the appellee has defined the coast or sea-shore to be the contact of the main-land with the main sea, where no bay intervenes, and with the latter, wherever it exists. This we believe to be substantially correct. The term coast undoubtedly suggests to the mind the place of meeting between the main-land and the water of the sea, where no bay intervenes; but it does not so readily suggest also the shores of the bays. It is rather by a process of reasoning than suggestion, that it is made to comprehend the shores of the ocean, and of the bays, as one unbroken line. But whether the laws on the subject should have been construed to include, or otherwise, the shores of the bays, as a part of the coast, can scarcely be regarded as now an open question. The Governor of the State, in 1826, decided that they should be included; and the contracts of colonization require the projection of the ten leagues into the interior to be, not from the coast proper of the Gulf, but from the mouths of rivers, all of which constituting boundaries emptying into bays; and whether their mouths be in the heads or lower down in the bays, made no difference with the authorities. The Executive, in his opinion, directed the measurement to be from the shore of the main-land, leaving thus the sea and the lagunas, having communication with it, since, according to his view, they should be considered as parts of one whole.

This continuous line of shore is the one fixed by nature as the exterior line of the coast leagues; and these leagues would be very easily defined, if an interior line, corresponding in all respects to the exterior, could be extended with any reasonable facility, or, if drawn, could be ascertained with such reasonable certainty as to be applicable to practical purposes. The contracts require the upper line to be drawn parallel with the

coast. How can this line be drawn parallel to the natural one which has every imaginable curvature and sinuosity? After the whole country is surveyed, it may not be an entire impossibility to trace upon the map, at least, the exact counterpart of the coast line, however irregular and diversified. But can any one imagine, that a government would require or attempt such a line in the settlement of a wilderness, for either political purposes, or fixing the boundaries of property? It would require more numerous monuments and land marks, to ascertain its position, than, perhaps, any other line ever drawn on the globe.

Let us suppose that the restriction on the colonization of the coast leagues had not been removed, and that the General Government had declared it punishable or treasonable to be found in that territory : could the officer or citizen ever know, with precision, when the boundary was passed? Or could an offender, by dodging from post to pillar, from one dark hole to another, and who, if he took a straight course, might be in and out of the boundary one hundred times in a day, be thus enabled to elude pursuit and escape the penalty of the law? And when this line is converted into one of property, the same difficulty, in ascertaining rights upon such line, would be experienced. Suppose every league of land on the coast were required to have on its upper end or side, curves corresponding to its coast boundary, and that the surveys were to extend on, in this way, fifty, sixty or one hundred miles into the interior, the confusion and uncertainty of boundaries would be intolerable and, of course, would never be permitted. The difficulty of extending such a line, on the upper boundary of the reservation, was one never solved by any officer of the former Government. They attempted to run no such line. The Commissioners and Surveyors of colonies had no time for an operation almost impracticable in itself, and which, if completed, would have been, as a line of boundary, both unique and preposterous. The line was always determined in some other mode than that of following the curvatures of the coast.

In this contract, the Surveyor run a straight line between the two outer termini of the end lines of the contract. A straight line in the whole or in part was the only line which could be of any practical service. I have no means of ascertaining whether any interior line was run or not, in the other coast colonies. It is believed that none was traced in Austin's coast contract.

Titles, it is presumed, were granted there as in other coast contracts, within what was supposed the limits of the reservation or ten leagues from the coast. I am not aware that any orders were issued by the State Government defining the upper limits of these leagues by natural boundary, or that the General Government ever issued but one order on the subject, and that was in reference to the border leagues. That was in August, 1830; and the government, through Gen. Teran, directed the boundary to follow the course of the river Neches to its junction with the Angelina; thence to retrocede to the Trinity, which running to the sea shall close the twenty leagues separated from the mouth of the Sabine river, and in consequence the colonization establishments and possessions, conceded on said lands, are subject to the approbation of the General Government. (See documents in the Land Office.) This extension of the boundary and the consequent proceedings of the Military Commandant at Anahuac, produced quite a spirited controversy between Madero, the Commissioner, and other State authorities with the officers of the General Government; and as long as the contest was confined to words, the former had the decided advantage, but it was abruptly terminated by military violence, the Commissioner imprisoned and the exercise of his authority forcibly suspended. This is believed to be the only instance in which the government attempted to fix the boundary; and its capricious and arbitrary character deprives it of all title to respect.

As before said, the interior line, for practical purposes, must be straight, in the whole or in its parts. The mode of running a straight line between the two upper points has but one

94

advantage, that of being easily understood.   But it can be applicable only where the line is short and there is no great curvature of the coast.   If long, and there is much deflection, it would enclose a much larger space than the ten coast leagues. If it were, for instance, from the upper point on the San Jacinto to the upper point on Lavaca river,'in Austin's coast colony, it would pass above the towns of Richmond and Wharton, and for a great distance be sixty or seventy miles from the coast.   As a general rule, this mode of running a straight line from a point on one extreme to a point on the other, should not be adopted.   There are various modes suggested, and, if time admitted, they are entitled to discussion.   But, under the circumstances, we cannot do more than state our conclusion, viz: that the mode adopted by Mr. Richardson, as we understand it, is one sufficiently accurate, and would more generally than any other practicable mode, approximate the imaginary line corresponding to the curvatures of the coast. It is understood that this Surveyor meandered the coast from the mouth of the Guadalupe to the mouth of the Nueces, and, plotting the surveys, laid down a straight line between the two points, and from the point of intersection with that line on Copano Bay, he run a perpendicular ten leagues into the interior, and from the apex run a line to either boundary parallel to the base line.   So far as can be judged from Cordova's map, this line does not, except in some very minute points, approach nearer than ten leagues—from any part of the coast. This mode is equally certain with the other, and does not involve the danger of swelling the reservation greatly beyond its legitimate proportions.   Adopting this line, as the best adapted for the definition of the limits of the Littoral Leagues, the grant of Buentello, except a small portion, being without such limit, is good in itself for all parts without the line; and the remnant, being on and adjacent to the boundary, is valid on the principles heretofore stated in this opinion.   Judgment reversed and cause remanded.

Reversed and remanded.