**STATE et al. v. HUMBLE OIL & RE-
FINING CO. et al.**

No. 2595.

Court of Civil Appeals of Texas. Waco.

Jan. 25, 1945.

Rehearing Denied April 5, 1945.

Grover Sellers, Atty. Gen., and Geo. W. Barcus, Asst. Atty. Gen., for appellant State of Texas.

McComb & Davis, of Conroe, W. T. Williams, of Austin, Sam Neathery, of Houston, W. T. Williams, Jr., of Austin, and

Sterling Williams, of Snyder, for appellants Davis and Williams.

C. W. Croom, of Houston, S. J. Bennett, of Durham, N. C., Matt H. Allen and Rivers Johnson, both of Kingston, N. C., and W. D. Siler, of Pittsboro, N. C., for appellants Hardy Washington Strickland and others.

James G. Davis, of Houston, and Willard Drake, of Birmingham, Ala., for appellants Jerry Strickland and others.

Ben F. Cone, of Waco, for appellant John Vince.

John O. Douglas, of Houston, and W. C. Dempsey, of Ashland, Ala., for appellants Willette Strickland Tobias and others.

E. G. Hobbs, of Selma, N. C., Edgar Monteith, of Houston, and Carl S. Farmer, of Abbeville, Ala., for appellants Matthew Strickland and others and Yancey Strickland and others.

J. D. Burns, of San Angelo, T. R. Johnston, of Big Lake, and Gordon M. Burns, of Huntsville, for appellants Mabel Bryant Wilson and others.

James M. Crane, of Conroe, and Geo. B. Culpepper, Jr., of Fort Valley, Ga., for appellants Roy Strickland and others.

Vinson, Elkins, Weems & Francis, John C. Townes, and E. E. Townes, Jr., all of Houston, Pitts & Liles, of Conroe, J. C. Wilhoit, of Houston, Jack W. Timmins, of Dallas, Pat N. Fahey, P. F. Graves, and R. E. Seagler, all of Houston, and G. D. Baten, of Beaumont, for appellees.

W. D. Gordon, of Beaumont, amicus curiae.

TIREY, Justice.

This suit was brought in trespass to try title to 495.22 acres of land (out of the Wilson Strickland Survey, patented July 3, 1847) now in Montgomery County, Texas. In December, 1931, numerous suits were filed by various alleged heirs of Wilson Strickland; one suit was filed by an alleged grandson of Allen Vince; another suit was filed by a group of Phillips heirs. W. T. Williams filed suit against Humble Oil & Refining Company and other oil companies, landowners, and royalty-owners in possession, claiming that the Wilson Strickland patent was void and that he was entitled to an oil and gas lease thereon from the State. He joined Nat Davis, who had on file with the Commissioner of the General Land Office a rejected application for a mineral lease on the property which antedated the rejected application filed by him. He also joined the heirs and legal representatives of Wilson Strickland, Allen Vince, John Vince and C. B. Stewart and various other claimants, some of whom he alleged their places of residence to be unknown, and also "the unknown heirs and legal representatives of all the above named defendants, the name and places of residence of all of whom are unknown to plaintiff." Under the 1939 Leasing Act, Vernon's Ann.Civ.St. art. 5421c, §§ 6 and note, 8, 5421c—1 to 5421c—3, the State intervened by formal suit in the trespass to try title and in a second count pleaded specially in the alternative to cancel the Strickland patent. The State's suit asserted the invalidity of the Strickland patent and claimed it had never parted with title ·to said land and claimed that its title was superior to all others and that the Strickland patent should be cancelled.

On motion all suits involving this particular tract of land were consolidated and tried as one suit. Upon the trial the State, Williams and Davis constituted themselves into one group and presented their evidence as one claim. Each family of alleged Strickland heirs claiming to be unrelated to each other family of alleged Strickland heirs, presented its respective claim in a separate group (seventeen separate groups), each group seeking to establish its family group as the true heirs of the original Wilson Strickland.

The trial began on August 26, 1940, before a jury and was concluded August 2, 1941, when the jury returned their verdict and the court entered its judgment under date of August 11, 1941. At the conclusion of the testimony the trial court granted the defendants' (Humble Oil & Refining Company et al.) motion for an instructed verdict against Williams, Davis and the State. The court also overruled motion of Williams, Davis and the State for an instructed verdict in their behalf and thereupon the court submitted to the jury the cause of the other claimants. The verdict of the jury was against each family group. After the jury's verdict was returned the trial court overruled motion of Williams, Davis and the State for judgment notwithstanding the verdict, whereupon the court rendered judgment for the Humble Oil & Refining Company and various landowners in possession against all other parties. This action of the court is assailed as er-

ror. The cause was appealed to the Honorable Ninth Court of Civil Appeals and later transferred to this court by order of our Supreme Court. The State, Davis and Williams filed transcript and statement of facts, and in addition to the appeal bond filed by Williams and Davis, eight of the other family groups filed separate appeal bonds and transcripts and when the cause reached the Ninth Court of Appeals the clerk gave each group filing a bond a separate style and number. We have this day, on our own motion, consolidated each of these eight appealing groups under the above number and style. We will now give our attention to the errors assigned by plaintiff Williams, Davis and the State of Texas.

 Since the State of Texas claims the land in question and since the trial court gave an instructed verdict against the State, Davis and Williams, the first major question that presents itself to us is: Did the State part with title to the land by virtue of the patent issued July 3, 1847? We think it did. It is obvious that if the State parted with its title, it has no further interest in the land and it necessarily follows that Davis and Williams have no claim. In passing upon this question "it is our duty to disregard all conflicts in the testimony; to consider the evidence adduced in the case in the light most favorable to plaintiff, and to indulge in his favor every intendment reasonably deducible from the evidence. Anglin v. Cisco Mortgage Loan Co., 135 Tex. 188, 141 S.W.2d 935. When the facts are controverted, or such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only when the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. Wininger v. Fort Worth & D. C. R. Co., 105 Tex. 56, 143 S. W. 1150." James v. Missouri-Kansas-Texas R. Co., Tex.Civ.App., 182 S.W. 2d 921, 922, writ ref.

The point raised is vital and requires a comprehensive statement.

Harris County was originally named Harrisburg County. Section 10 of the Constitution of the Republic of Texas adopted March 17, 1836 (See Hartley's Digest, p. 38) provided: "Section 10. All persons (Africans, the descendants of Africans and Indians excepted) who were residing in Texas on the day of the Declaration of Independence, shall be considered citizens of the Republic, and entitled to all the privileges of such. All citizens now living in Texas, who have not received their portion of land in like manner as colonists, shall be entitled to their land in the following proportion and manner: Every head of a family shall be entitled to one league and labor of land; and every single man of the age of seventeen and upwards, shall be entitled to the third part of one league of land." According to the Lost Book of Harris County, Wilson Strickland made claim to one-third of a league of land under the above provision of the Constitution. Certificate 423, for one-third of a league of land, was issued to Wilson Strickland on March 16, 1838, by the Board of Land Commissioners of Harrisburg County. This certificate was conditioned on his paying a certain price per labor of land depending on its character. John Carson, Deputy Surveyor, made a survey of the land patented to Strickland subsequent to the 1st of July, 1838, and prior to August 15, 1838. George M. Patrick, County Surveyor of Harrisburg County, certified that he had examined the field notes and found them correct and the survey made according to law. On August 31, 1839, Wm. M. Burch, as agent of Wilson Strickland, paid in full to the Secretary of the Treasury of the Republic of Texas the consideration due as certified by John P. Borden, Commissioner of the General Land Office of the Republic of Texas. On January 29, 1840, the Republic passed an act to detect fraudulent land certificates. See 2nd Gammel's Laws of Texas, p. 313, Hartley's Digest, Art. 1946. This act provided for the election of three commissioners whose duty it should be to visit each county west of the Brazos River and three to visit each county east of the Brazos River and in conjunction with three county commissioners from the respective counties to inspect the records of the Boards of Land Commissioners and ascertain by satisfactory testimony what certificates for land had been issued to legal claimants and report as soon thereafter as practicable to the Commissioner of the General Land Office such certificates as they found genuine. The Land Commissioner was instructed by the Act to issue a patent upon the return of a survey by authority of a certificate reported as legal and genuine by the Investigating Commissioners, and he was prohibited from issuing

a patent upon any survey "that shall not have been or may hereafter be made" by authority of a certificate returned as genuine and legal by the Commissioners. This act contained no provisions as to the rights of a person whose certificate might not be approved by the Investigating Commissioners. On February 4, 1841, Congress passed an act supplementary to an act to detect fraudulent land certificates. 2nd Gammel's Laws, p. 635, Hartley's Digest, Art. 2035. This supplementary act provided that the holder of any certificate which might not have been recommended by the Traveling Land Board might file suit in the District Court to attempt to establish the genuineness of his certificate. The claimant, if successful, had to pay ten dollars costs; if unsuccessful, he had to pay fifty dollars costs. This supplementary act set no time limit for filing suits.

It is without dispute that when the Traveling Land Board visited Harris County some of the records were missing and the Board did not have an opportunity to examine them. The lost records were found some six weeks after this Board had held its session and the then Clerk of Harris County called this matter to the attention of the Commissioner of the General Land Office. This officer called the matter to the attention of Congress by letter of October 13, 1841. Thereafter, on December 20, 1841, Congress passed an Act for the Relief of John S. Black and other citizens of Harris County. 2 Gammel's Laws, p. 691, Hartley's Digest, Art. 2078. This act provided: "That the tribunal or Board of Land Commissioners of the County of Harris, created by an Act entitled 'An Act defining the mode by which holders of conditional· certificates shall establish same,' approved January fifteenth, one thousand eight hundred and forty-one, shall form and constitute a Board for the said County of Harris, to investigate all claims the record of which were lost or mislaid during the investigation of the Board of Commissioners appointed under an Act entitled 'An Act to detect fraudulent land certificates, and provide for the issuing of patents to legal claimants' and which claims have never been passed upon by said last mentioned Board." The Relief Act provided that any holder of a certificate issued by the Board of Land Commissioners of Harris County which had not been examined by the Traveling Board might apply to the tribunal "to execute to the said holder a certificate that they have examined said claim and find same legal and justly entitled against the Government." The act concluded "that it shall be the duty of the Commissioner of the General Land Office to issue patents upon all claims which may be certified as genuine, and justly entitled, in accordance with this Act, in the same manner as though the same had been recommended by the said Board of Commissioners appointed under 'An Act to detect fraudulent land certificates.'"

On March 26, 1847, the Board of Land Commissioners of Harris County executed a certificate to the holder of the Wilson Strickland Certificate No. 423, dated March, 1838, which certificate, among other things, recited: "This is therefore to declare that the said Wilson Strickland is entitled to an unconditional headright of One-Third of a league of land by virtue of his immigration and the aforesaid certificate." Thereafter, on July 3, 1847, patent to the Wilson Strickland Survey was duly issued.

The appellees introduced in evidence a certified copy of the Lost Book of Harris County. This book contains the record of some 300 claims. The record of the Wilson Strickland certificate appears on page 58 (Exhibit D-242, shown on page 33 thereof) of this Lost Book. The Act for the Relief of John S. Black and others was passed for the benefit of the holders of the certificates, the records of which appear in the Lost Book. But the State contends substantially that the Act of February 3, 1845, passed by Congress (2 Gammel's Laws, p. 1156, Hartley's Art. 280) had the effect to repeal the act passed for the relief of John S. Black and others. We cannot agree with this contention. The Act for the Relief of Black and others named the Chief Justice and the two Associate Justices of the County Court as a Board to pass upon claims based on the records in the Lost Book. At that time (1841) the Chief Justice was elected by a popular vote and two Associate Justices were selected by a majority of the Justices of the Peace. These three constituted the County Court. The Act of Feb. 3, 1845, passed by the Congress did change the number of members constituting the County Court and the method of the selection of four of them, but we do not think that such act had the effect of destroying the tribunal which under the Act for the Relief of John S. Black and others was empowered to pass upon the validity of the certificates listed in the Lost

Book. The Act of February 3, 1845, does not mention the John S. Black Act, nor is there anything in it to indicate that Congress was attempting in any way to change or modify that act. The John S. Black Act had made the County Court as it was then constituted the tribunal which was authorized to pass on the validity of the certificates listed in the Lost Book, and the Act of February 3, 1845, did nothing to alter this. The act did change the method of selecting some of the members of the County Court and it increased the number. The new court provided for by the Act of February 3, 1845, was still the County Court and it was still the tribunal which, under the John S. Black Act, was empowered to investigate and pass upon the validity of the claims listed in the Lost Book.

It is true that the Harris County Board did not have occasion to pass on the Wilson Strickland certificate until March 26, 1847, which was after the days of the Republic and at a time when the laws passed by the Legislature of the State of Texas were in effect. However, on May 13, 1846 (2 Gammel's Laws, p. 1639, Hartley's Art. 285) the Legislature passed an act organizing County Courts. Section 14 of this act provides: "Be it further enacted that the several county courts of the State shall have and exercise all the powers which by law are vested in county courts or boards of county commissioners or chief and associate justices as land commissioners." This act became effective on March 26, 1847, when the members of the County Court of Harris County, acting as a tribunal or board, examined the Wilson Strickland Certificate No. 423, and found that it was genuine. It is clear to us that under the terms of the Act of May 13, 1846, the County Court was vested with the power and duty to act as a tribunal within the terms of the John S. Black Act. (A certified chart showing the name of each person whose claim in the Lost Book was confirmed by the Board of Land Commissioners acting under the John S. Black Act, and showing all data as reflected by the files of the General Land Office on surveys and patents issued thereon, was tendered in evidence as Exhibit D–399, and Wilson Strickland's name appears on page 11 thereof.)

Our view is that the contention of the State, Davis and Williams that the Wilson Strickland certificate was not recommended by the Land Board which was created to detect land frauds is contrary to the undisputed record. But the State contends that since no suit was filed on the Strickland certificate prior to January 1, 1844, it became null and void, and this contention, as we understand it, is based on the Act of February 4, 1841, which gave certificate holders the right to file suit in the district court for the purpose of perfecting their certificates and claims. This contention is overruled.

The Act of February 4, 1841, was called a supplementary act. On January 14, 1843 (2 Gammel's Laws, p. 839, Hartley's Art. 2102) Congress passed an act supplementary to the Act of February 4, 1841. This Act provided: "Be it enacted by the senate and house of representatives of the Republic of Texas in Congress assembled, that all suits contemplated by the first section of an act to which this is a supplement shall be commenced on or before the first day of January, 1844, and not thereafter." It is the contention of the State, Davis and Williams that this statute had the effect of taking away from all parties the record of whose certificates was shown in the Lost Book the relief which had been granted them by the John S. Black Act. We cannot agree with this construction. The act makes no mention of the John S. Black Act and recites that it is supplementary to an act which was in effect when the John S. Black Act was passed. The fallacy of appellants' position is that Congress, by the John S. Black Act, had provided previously in effect that these people did not have to file suit but that they might go to the special tribunal and have their certificates approved, and this act set no time limit in which these certificate holders should present their certificates to the special tribunal. The State also contends that by virtue of Section 2 of Article 11 of the Texas Constitution of 1845, the district courts of the state which had been closed since January 1, 1844, were reopened for the benefit of Wilson Strickland and those other people, the record of whose certificates was in the Lost Book, in order that they might file suit on those certificates; the State contending that under this constitutional provision all other means of establishing the validity of their certificates were taken away from those claimants to whom relief had been granted by the John S. Black Act unless they filed suit by July 1, 1847. This contention is overruled. We think it is clear that the certificates which were barred under this constitutional provision were

those which were not established or sued upon. We doubt if this provision had any application to the Lost Book certificates (a question which we are not called upon to decide), but even if it should apply, it would not be applicable to the Wilson Strickland certificate because it was established (March 26, 1847) before July 1, 1847, the date mentioned in this section, and for that reason said provision did not bar the Wilson Strickland certificate. It follows that we are of the opinion that the holder of the Wilson Strickland certificate did not lose his rights because he failed to file suit by January 1, 1844, the date named in the act of January 14, 1843, nor by July 1, 1847, the date mentioned in the foregoing provision of the Constitution; nor do we find that the John S. Black Relief Act had been repealed. There is no express repeal of this act. Section 3 of Article 13 of the Constitution of 1845 provided: "All laws or parts of laws now in force in the Republic of Texas, which are not repugnant to the Constitution of the United States, the joint resolutions for annexing Texas to the United States, or to the provisions of this Constitution, shall continue to remain in force as the laws of this State until they expire by their own limitation, or shall be altered or repealed by the legislature thereof." We think this section continued the John S. Black Act in force. We think the rule in Texas is that the repeal of statutes by implication is never favored or presumed. When a new statute is passed dealing with a subject covered by an old law, if there is no express repeal, the presumption is that in enacting a new law the Legislature intended the old statute to remain in operation. See 39 Tex.Jur. sec. 75; Townsend v. Terrell, 118 Tex. 463, 16 S.W.2d 1063; Parker v. Bailey, Tex.Com. App., 15 S.W.2d 1033; Wintermann v. McDonald, 129 Tex. 275, 102 S.W.2d 167. Moreover, the John S. Black Act was a special act for the benefit of a class. The Act of February 3, 1845, referred to, was a general act. The enactment of a general law does not originally operate as a repeal of a particular or special law, by implication, although both relate to the same subject matter. On the contrary, both statutes are permitted to stand, and the general law is applicable to all cases not embraced by the specific act. The special act is construed as constituting an exception to the general law. See Townsend v. Terrell, supra; Flowers v. Pecos River Co., 138 Tex.

18, 156 S.W.2d 260; Tolleson v. Rogan, 96 Tex. 424, 73 S.W. 520.

The appellees also offered the complete files of the Land Office on each of the certificates shown in the Lost Book. Part of these certificates were confirmed prior to February 15, 1846. The patents issued on certificates confirmed prior to February 15, 1846 covered more than 122,000 acres. Other certificates were confirmed subsequent to February 15, 1845, and prior to December 2, 1850, and these certificates covered in excess of 234,000 acres. It is the State's contention that each of the patents which was based on confirmation dated subsequent to January 1, 1844, is null and void. As a basis for this contention the State says that the Act of January 14, 1843, had application to those certificates listed in the Lost Book, and that the failure of the holders to file suit prior to January 1, 1844, rendered the certificates null and void. It appears that 40 of these certificates in the Lost Book were confirmed subsequent to January 1, 1844, and prior to February 15, 1846, and that 114 certificates were confirmed after February 15, 1846, and that no confirmation was had through the district court. All of these confirmations were made by the same tribunal of Harris county as confirmed the Wilson Strickland certificate and were accepted by Commissioner of the General Land Office and patents were executed by the Governor and Commissioner of the General Land Office holding office at that time. If the State's contention that the failure of the holder of the Wilson Strickland certificate to file suit in the district court to establish the validity of his certificate prior to July 1, 1847, renders the Wilson Strickland patent invalid, then each of the other 154 patents last above referred to based on certificates confirmed after January 1, 1844, is likewise invalid. It is obvious that all officials charged with the administration of our land laws were of the opinion that the Black Act was still in full force and effect until 1850, and that the officials constituting the County Court of Harris County had power to act as a tribunal under said act. In fact, it appears that in 1850 the Commissioner of the General Land Office submitted to the Attorney General of the State the question as to whether the law for the relief of John S. Black and others had expired. The Attorney General, by written opinion, held that up until March 1, 1850, the Board of Land Commissioners of Harris County had full authority to act as a

tribunal under the Black Act. The opinion of the Attorney General was based on the fact that on March 1, 1848, the Legislature had passed an act stating in effect that after March 1, 1850, no board of land commissioners should have the power to issue an unconditional certificate. Thereafter, on December 2, 1850 (3 Gammel's Laws p. 860) the Legislature passed an act instructing the Clerk of the County Court of Harris County to transmit to the Commissioner of the General Land Office the book known as the Lost Book. If the State's contention is correct, then it appears that it had issued 156 invalid patents from the Lost Book. The Commissioner of the General Land Office was ordered to file this book as one of the archives of his office, Art. 250, sec. 4, Revised Civil Statutes 1925, and he was required to issue patents on the certificates mentioned in the book which had never been acted on or rejected by the Board of Commissioners appointed to detect fraudulent land certificates. See 3 Gammel's Laws p. 887, Act of December 8, 1851. By this Act of December 8, 1851, the Legislature again determined that those people, the record of whose certificates appeared) in the Lost Book, were entitled as a class to have relief. Thus, on two separate occasions, we find that the Legislature recognized the validity of the certificates recorded in this Lost Book on which no suit had been filed.

We have carefully examined each of the exhibits relating to the Wilson Strickland· Certificate No. 423, and we are of the opinion that it was returned as a genuine certificate by the tribunal authorized by the John S. Black Act to pass on such matters, and that the patent issued by the State of Texas on July 3, 1847, based on this certificate, is a valid patent.

The next question that presents itself is: Since it is without dispute that the Deputy District Surveyor of Harris County surveyed the Wilson Strickland Survey and prepared the field notes thereto, was the land embraced in said field notes and afterwards patented actually in Harrisburg County at the time the survey was made; or, if at the time the land was surveyed and the field notes prepared such land was not in Harrisburg County, did it lie within a doubtful zone or area which was shown on the maps available in the State Land Office as being in Harrisburg County and was believed by the Land Commissioner and all others dealing with the area in good faith to be in Harrisburg County, and did the issuance of the patent validate the survey and make the patent legal? Or, in the event that the land in controversy actually lay in Montgomery County at the time it was surveyed and field notes prepared by the County Surveyor of Harrisburg County in 1838, did the patent to Wilson Strickland validate the same and thereby bind the State and all other parties? The discussion of these ·questions necessarily requires a comprehensive statement.

The boundaries of the municipality of Washington were defined in 1835 and it was bounded on the south by the northern lines of the municipality of Austin and Harrisburg. See 1 Sayles Early Laws, p. 620. The boundaries of the municipality of Harrisburg were defined by decree of January 1, 1836 (1 Gammel's Laws 1022) as follows: "Beginning at the entrance of Clear Creek into Galveston Bay, running up said creek with the line of the municipality of Brazoria and with said line to the Brazos river; thence up said river to the upper line of a league of land granted by the Mexican government to Isaacs; thence along said line to the northeast corner of said league; thence northwardly, to include the settlements on Spring Creek, to the southern line of the municipality of Washington; thence eastwardly along said line of the municipality of Washington, and so far eastwardly as to intersect the line dividing the department of Brazos and Nacogdoches, thence southwardly along said line to Galveston bay; thence to the place of beginning." This act specifically included the settlements on Spring Creek to the south line of the municipality of Washington. It is obvious from the Acts of 1835 and 1836 that the south line of the municipality of Washington, the eastern part of which later became Montgomery County, was at that time north of the Spring Creek settlements. By Act of December 17, 1836, 1 Gammel's Laws 1193, the Chief Justice of Harrisburg County was required to furnish a description of its boundaries. It is true that on January 30, 1837, Chief Justice Briscoe wrote the Secretary of State wherein he said: "I send you a statement of the boundaries of Harrisburg County as nearly as I can ascertain them in the absence of laws creating them." We think it does not appear that a survey of the county boundaries had been made at that time and it does appear from the statement of Chief Justice Briscoe that he did

not know exactly where the true lines were. It is true, as contended by the State, that if a line were projected due east from the source of Spring Creek, same would not include within Harrisburg County the settlements on Spring Creek. Therefore, Briscoe's description was erroneous within itself because it conflicted with the provision of the Act of January 1, 1836. There was evidence to the effect that there was some ambiguity as to the location of the common line between Harrisburg County and Montgomery County and the Congress re-defined the "boundaries of Montgomery County by Act of December 14, 1837." 1 Gammel's Laws 1375. (It is without dispute that the land in question as it now lies in Montgomery County is slightly in excess of five miles from the boundary line of Harris County.) Section 1 of this Act provides that all of Washington County lying east of the Brazos and southeast of the Navasota Rivers should be Montgomery County. Section 6 provided "that the lower line of the County of Montgomery shall commence at the mouth of Lake Creek; thence in a direct line to the head of Pond Creek, and thence in a direct line to the mouth of Beeson creek; thence up the Brazos River to the mouth of the Navasota River." On the same day the surveyors of Harrisburg and Montgomery counties were directed to survey the boundary line between their counties. This survey was not made until March, 1841. The field notes of said county line were jointly returned to the General Land Office by the surveyors of both counties, and on the letter of the surveyors a sketch was drawn. Much evidence was tendered with reference to the Henderson-Bullock 1841 county line, the field notes of which actually place said line on the ground, and it appears to us that reasonable minds cannot differ that the Act of December 14, 1837, together with the line as surveyed by Henderson-Bullock in 1841, left that part of Harrisburg County on the east side of the San Jacinto River, extending north of the mouth of Lake Creek, with the result that the Wilson-Strickland Survey was at that time within Harrisburg County.

The boundary of Montgomery County was again defined by the Congress by Act of May 24, 1838. 1 Gammel's Laws 1518. By this act the boundary line was called to run west and south with the boundary of Liberty County "till it strikes the northern boundary line of the County of Har-

risburg; thence west with the boundary line of said county to the County of Austin." It is clear that no change was made in the location of the line as surveyed in 1841 under the 1837 Act, and under the Act of 1838 the Wilson-Strickland Survey was in Harrisburg County. The Montgomery County boundary was again changed by the Act of 1840. See 2 Gammel's Laws 396. And the boundaries were called to follow the meanders of Spring Creek from its head to the San Jacinto River; "thence N. 50 deg. E. to the western line of Liberty County." Our view is that this Act for the first time definitely located the southern line of Montgomery County and the northern line of Harris County at all points between the head of Spring Creek, crossing the San Jacinto River and extending eastwardly therefrom, and that such description for the first time placed the Wilson-Strickland Survey in Montgomery County.

We think it is clear that the Wilson Strickland Survey and others had been surveyed and located on the ground by the surveyors of Harrisburg County at a time when the land was definitely within the boundaries of Harrisburg County and of course the validity of such surveys was in nowise affected by a subsequent change of the boundary.line.

Moreover, on April 6, 1844, the County Surveyor of Montgomery County wrote the Commissioner of the General Land Office in part as follows: "I have not as yet been able to get a connected map of the surveys returned in the County of Harris which now are included within the limits of Montgomery. I wrote to the County Surveyor of Harris relative to the matter and he replied that he had not as yet received any communication from you on that subject but would attend to the matter as soon as required by you to do so. I hope you will as soon as practicable make this requisition of him as it is impossible to complete the map of this county until that is done. I would also suggest that the County Surveyor of Harris be required to transcribe in a well bound book all the surveys which may be included within the limits of this county and certify to the same in a proper manner which can be deposited with the records of this county as a part of the same." Thereafter on June 12, 1844, the Land Commissioner wrote the Surveyor of Harris County in part as follows: "You will make out and deliver to

the Surveyor of Montgomery County as soon as possible a connected map of such surveys that have been returned to your office as are now within the limits of Montgomery County and you will also deliver to him a properly certified transcript of the record in your office of said surveys." The next day the Land Commissioner advised the surveyor of Montgomery County of the action he had taken. The County Surveyor of Harris County did make such surveys and presented an itemized bill of his work for his services, one item of which was "writing transcript of field notes returned to Harris County north of Spring Creek now in Montgomery County as per instructions from the Commissioner General Land Office dated 12 June A. D. 1844 * * *." It also appears that the County Surveyor of Montgomery County, under date of September 2, 1844, received from the County Surveyor of Harris County a transcript of surveys returned and recorded in Harris County, "also connecting plat of said surveys lying north of Spring Creek and north of a line running from the mouth of Spring Creek North 50 deg. East to the west boundary line of Liberty County, as defined by the last act of Congress defining the boundary line between Montgomery and Harris Counties."

It also appears that the field notes for the Wilson-Strickland Survey, as recorded in Surveyors' Records of Harris County, bear a notation: "Copy sent to Montgomery County." Testimony was tendered to the effect that many of the records of the County Surveyor's Office of Montgomery County have been lost or destroyed, and that the field notes last above referred to are not now among the present records of the County Surveyor of Montgomery County; however, the records were still in the office of the County Surveyor of Montgomery County as late as 1893. On September 14, 1893, the County Surveyor of Montgomery County wrote the Commissioner of the General Land Office concerning the Wilson-Strickland Survey in part as follows: "The location and field notes appear on the surveyor's records and no assignee appears there. It was located in Harris County and that part of the County was attached to Montgomery and the Surveyor's Records transcribed by Geo. Bringhurt in 1838 or 9, and the original remains in my office." Much testimony was tendered with reference to various official maps made of this particular area.

Exhibit D–10 is an 1839 map of Texas compiled from surveys on record in the General Land Office of the Republic to the year 1839 and certified to by the First Commissioner of the General Land Office of Texas. This map shows the north line of Harrisburg District (being the south line of Montgomery County) running from the head of Spring Creek in a course approximately north 45 degrees east to the junction of the Liberty District west line with Big Creek. This line crosses the San Jacinto River many miles north of the mouth of Lake Creek, and many miles north of the Wilson Strickland Survey, and this map places the Wilson Strickland Survey in the Harrisburg District. (Exhibit D–11 is a white photostatic copy of D–10 and is more easily read.)

Exhibit D–12 is designated as General Austin's map of Texas with parts of adjoining states, compiled by Stephen F. Austin, published by H. S. Tanner, of Philadelphia, and certified to by the State Librarian to be a true and correct photostat of said map. This map was published in 1840 after the death of Stephen F. Austin in 1839. This map shows the division line between Harris and Montgomery Counties as running from the head of Spring Creek on a course somewhat north of east, crossing the San Jacinto River at the mouth of Grimes Creek and extending to the western boundary of Liberty County. This map is in accordance with the General Laws of 1836 fixing the boundary of Harrisburg District and with the Briscoe 1837 definition of the north line of Harris County, beginning at the head of Spring Creek and running easterly so as to include the settlements on Spring Creek. We think it is in substantial accord with the Act of December 14, 1837, fixing the south line of Montgomery County and with the Henderson-Bullock 1841 survey. We think this map also shows the Wilson-Strickland Survey in the Harrisburg District, or Harris County.

Exhibit D–32 which is a hard copy map of Montgomery County, dated February 13, 1855, also shows the Henderson-Bullock 1841 line extending in a northeasterly direction from the lower left-hand corner of the map, toward the center portion thereof and intersecting the San Jacinto River at the mouth of Lake Creek. If this line be projected on the same course in an easterly direction to the west line of Liberty County, the Henderson-Bullock line will

correspond almost precisely with the District Line shown on Stephen F. Austin's map referred to. The comparison of map D–32 with Exhibit D–74 reveals that the tier of surveys on the east side of the San Jacinto River and running south from the mouth of Lake Creek, are identical in each instance. We think a careful study of Exhibit D–32 aforesaid, which is the map kept by the County Surveyor in Montgomery County as required by law and later returned to the General Land Office, definitely puts the Wilson-Strickland Survey south of the projected Henderson-Bullock line of 1841 and within Harrisburg District at the time it was surveyed. Again, Exhibit D–33 which is the official land office map of 1861, shows the District line as run by Henderson and Bullock in 1841 on a north 73 degree east course from the lower left-hand corner of Exhibit D–33, crossing the San Jacinto River at the mouth of Lake Creek. We think this map also shows the Wilson-Strickland Survey within Harrisburg District at the time it was surveyed. We think it is clear from a study of these maps that the Harris District and County Surveyors, in making the surveys in 1838 (at which time the Wilson-Strickland Survey was made) knew approximately where the then true boundary line was and conducted all of their surveying work south of said line as subsequently located and surveyed by Henderson and Bullock in 1841. It appears from the records without dispute that more than 150,000 acres of land patented on Harris County Surveyors' field notes in what is now Montgomery County are still recognized as validly patented on said field notes, and none of these patents had, at the time of the trial, been questioned by the State prior to this present litigation. It also appears from the record without dispute that after the Act of 1840 fixed the present line between Montgomery and Harris Counties east of the San Jacinto River as a line running North 50 degrees East from the mouth of Spring Creek, no Harris County surveyor attempted to make a survey north of said line, but that all surveys theretofore made north of that line by Harris County surveyors have been patented and recognized to this time.

But appellants contend that the Wilson-Strickland Survey is void because it cannot be located on the ground. We overrule this contention. In passing upon this question it is necessary for us to keep in mind what we have previously said concerning the various boundary statutes referred to and the maps discussed. According to the evidence of Stuart Boyles, a licensed surveyor, John Carson, Deputy Surveyor of Harrisburg District, in 1838 surveyed and laid in a system or series of surveys in the area involved in this suit. Among them we find the John Owens League on the south; northward through the Anna Matilda Wilburn Survey, which was patented; the Mary Owens Labor, which was patented; the Thos. Robinson League, which was patented but afterwards floated and relocated in Fannin county; the John Owens Labor, which was surveyed but not patented; the Wilson Strickland Survey, which was surveyed as a part of the series and patented; the R. H. Chinn and John Standsberry Leagues, which were surveyed as a part of the series but not patented; C. W. Collins Survey, which was surveyed as a part of the series and patented; and the L. B. Weeden, assignee of L. R. Owens Survey, which was a part of the system and patented. These surveys call for each other.

The witness Boyles testified without contradiction substantially that the northeast corner of the John Owens League is well established and recognized and occupied on the ground; that it very closely satisfies the river calls on both its south and north lines; that in his own surveying work on the north line of the John Owens, he found original locations of the original surveyor Carson; that the northeast corner of the L. B. Weeden (L. R. Owens Survey) had been identified and located by the original witness trees; that from these original locations and corners he ran without difficulty the connecting lines of the other surveys in the system and located the Thomas Robinson League on the ground; that the Thos. Robinson League was located by Carson at or about the same time he surveyed and located the Wilson Strickland Survey. From Boyles final notes on the Wilson Strickland Survey he calls to begin at a point (see Exhibit D–33) "on the Thos. Robinson east boundary of a league previously surveyed and 2000 varas from the southeast corner of the Robinson Survey; thence east for a second corner, at 40 vrs. cross creek 4 vrs. wide running southwest 2887 vrs. to a post, a dogwood marked X marked N. 86 deg. W. 7 varas distance; thence North for third corner 2887 vrs. to a post, a white oak marked X bearing south

39 deg. E. 1.5 vrs. distance; thence west for fourth corner at 500 vrs. cross creek 3 vrs. wide running southwest at 1040 vrs. cross branch 1 vara wide running south at 1080 vrs. cross creek 3 varas running northwest at 1200 varas cross creek 3 vrs. wide running southwest at 1220 vrs. cross branch 1 vrs. wide running south, at 2240 vrs. cross creek 2.5 vrs. wide running southeast, at 2883 vrs. to a white oak marked X for fourth corner of said tract on Robinson's east boundary of League; thence south for first corner with Thos. Robinson east boundary 582 vrs. cross branch running east at 2487 vrs. cross creek 5 vrs. wide running southwest at 2737 vrs. cross creek 5 vrs. wide running southeast and at 2887 vrs. to a post—the beginning corner."

■ But the State contends substantially that the field notes as made by Carson or those contained in the patent do not sufficiently describe the land so that same may be identified on the ground as a matter of law. We overrule this contention. The general rule is: "The primary objective in locating a survey is to 'follow the footsteps of the surveyor'; by which is meant to trace on the ground the lines as he actually ran them in making the survey. This following or retracing the surveyor's footsteps is necessarily a deduction from available evidence, since we have no means of actually following him in the flesh. * * * Of primary importance is what the surveyor himself said in his field notes with reference to where he went and what he did. Consequently when the points he has therein designated as marking the lines he actually traced can be located on the ground with certainty, and as so located present no inconsistency or conflict, the survey must be laid out from those points, and extraneous evidence cannot be admitted to contradict the assertion of the surveyor that he actually went to the points he so designated. * * *" Humble Oil & Refining Co. v. State, Tex.Civ.App., 162 S.W.2d 119, points 11 and 12, page 132, writ ref. The witness Boyles also testified in detail the manner in which the Wilson-Strickland Survey can be located from its own field notes on the ground. We think a check of the field notes in the original survey with the various maps and plats introduced in evidence satisfied each call for natural objects as reflected in the Strickland original field notes and also satisfied the call for the Thos. Robinson League,

whose southeast corner is also the southwest corner of the Mary Owens Labor (see Exhibit D–74), which was patented under the Harrisburg District Survey by John Carson and patented on the notes made by Carson. Boyles said that he had surveyed the area where the Wilson Strickland Survey was located in detail and testified specifically "and in attempting to locate the Wilson Strickland Survey, I will state that the patent along its north line calls for, first, going west, calls for creek, and then it calls for a branch and then it calls for a creek and then calls for a creek again, and then calls for a branch and then calls for another creek; and there may be some other place in Harris County or Montgomery County that such a condition on the ground can be fitted, but if there is I don't know where it is; but there is a position on the ground in Montgomery County that will satisfy or substantially satisfy the creek crossing calls of the Wilson Strickland patent on the ground. * * * There is an area in Montgomery County that the creek crossing calls given on the north line of the Wilson Strickland in that patent, and the creek crossing calls given on its west line and near its southwest corner on its south line, that can be very closely checked in 1938 and 1939 to satisfy the calls as reflected in the patent of 1847. That is the position in which I have located the Wilson Strickland Survey, and which also corresponds, as previously stated, to the position on all county maps of Montgomery County, not a few, but all county maps of Montgomery County." (See Exhibits D–74 and other exhibits herein referred to.)

The witness Boyles was County Surveyor of Harris County for about twenty-five years, and he further testified in part: "* * * I can truthfully say that I do not believe there is a survey in Harris County that I have not worked on, either in whole or some part of its boundary. That covers a lot of territory. The county is about sixty miles east and west and about forty miles north and south. * * *

"Q. With that familiarity with the terrain and surveys in Harris County, and with the familiarity you have with the land in Montgomery County, as indicated by the surveys you recall having made, do you know of any place at all in either Harris County or Montgomery County, where objects on the ground, such as creek crossings, will fit the patent notes of the Wilson Strickland Survey, other than this

area that you have testified about and indicated on this map today? A. I know of none. I have not done the same amount of surveying in Montgomery County that I have in Harris County, but I have covered practically everything from the west river to the east river, insofar as the East San Jacinto and the West San Jacinto, as it might affect the location of surveys in the Conroe Field or Splendora Field; and in Harris County I placed every survey of record in the county on the map; and there is certainly no place there where you can get the same conditions."

We think that a careful study of Exhibit D-33, which is the official land office map of 1861 shows the Wilson-Strickland Survey in the same position with relation to surrounding surveys as the witness Boyles placed it on the ground. To the same effect is Exhibit D-34, which is the official land office map of Montgomery County, marked "Corrected to Date—Gen'l Land Office—Nov. 19th 1895." Exhibit D-74, the official land office map of 1901, is to the same effect. The sketch of the Wilson-Strickland Survey on its original field notes shows it to ʼlie just east of and adjoining the Thos. Robinson League.

The witness Boyles testified at great length and in much detail with reference to the location of the original county boundary line and with reference to the various maps offered in evidence and the various patented areas where the Wilson-Strickland Survey is located, and it is our view that Boyles' testimony is not contradicted on any material matter, and we are of the opinion that reasonable minds cannot differ on the fact that the Wilson Strickland Survey lay in Harrisburg District at the time it was surveyed in 1838, and we are likewise of the opinion that it can be located from the ground location of the Thos. Robinson league; that it can be located by the calls of its own field notes, and that its location is established by the official maps and the recognition thereby accorded. If Boyles was an interested witness, still the rule is "when the evidence of an interested witness is direct and positive on the point at issue, and where there are no circumstances in the record tending to discredit or impeach his testimony, a verdict contrary thereto will be set aside, that such testimony will justify an instructed verdict, and that a judgment contrary thereto may be reversed and rendered." Dunlap v. Wright, Tex.Civ.

App., 280 S.W. 276, 279, point 6 for collation of authorities. No testimony was tendered undertaking to locate the Wilson Strickland Survey in any position on the ground other than in the position testified to by Boyles, and as shown on the maps referred to.

Is the location of this particular tract of the Wilson Strickland Survey affected by the doctrine of stare decisis because of the opinion of the Beaumont Court of Civil Appeals in the case of Wilburn v. Abercrombie, 125 S.W.2d 408, writ ref.? We think it is. The above suit involved the title and location of a portion of the Wilson Strickland Survey. Roberts, the surveyor referred to in the above opinion, also testified in the case at bar, and he located the Wilson Strickland Survey at the same place on the ground that the court found it to be in the above case. Moreover, the opinion, supra, locates said survey on the ground with reference to the location of the small Trevathan Survey and the small S. Y. Sitton Survey, all of which is shown by the various maps and exhibits introduced in evidence upon the trial of this case (see Exhibit D-400), and we think it is clear that the decision places the Wilson Strickland Survey on the ground as it is shown on the maps and exhibits offered in evidence, and also in the same position as testified to by surveyor Boyles. The patent of the small Trevathan Survey and also of the S. Y. Sitton Survey are both in evidence and both of these patents call for the Wilson Strickland Survey and do not conflict with it. Our view of the record is that there is no testimony in the record that undertakes to locate the Wilson Strickland Survey in any position on the ground other than the position and location testified to by the witness Boyles and as shown on the maps offered in evidence. See also State v. Franco-American Securities, Tex.Civ.App., 172 S.W.2d 731, point 13, writ ref. WOM.

But appellants contend in effect that the James Wilson Survey which was made by Wade, District Surveyor of Montgomery County, on January 18, 1839, and recorded in the Transcribed Surveyor's Records of Montgomery County, is of such prior validity as to extinguish the Wilson Strickland patent. We cannot agree with this contention. It is without dispute that the field notes of the James Wilson Survey were never returned to the Land Office and no patent was ever issued thereon; and it

is likewise without dispute that this survey was made junior to the Wilson Strickland Survey and the James Wilson field notes in Montgomery County were abandoned and the certificate to the James Wilson Survey was floated and the land relocated in Fannin County. The elder grant prevails. See Ledyard v. Brown, 27 Tex. 393. The James Wilson Survey does not appear on any official Land Office map and the field notes were never returned to the Land Office and the Land Office never had any data or information from which they could place it on their official maps.

On December 5, 1892, L. Burns, County Surveyor of Montgomery County, wrote the Land Commissioner: "I would like to have information relative to 640 acres (donation) which is called for in Ransom House's one-third of a league and labor located in this county, the same 640 acres being called for as the James Wilson Survey. A survey in the name of Wilson Strickland appears on the map and patented. It covers the 640 acres alluded to and a part of the Ransom House. Parties have applied for 640 acres as vacant land. I am unable to know whether the same is vacant or not. If the Wilson Strickland patent has been cancelled and the Wilson 640 acres filed on, the field notes and plat would show in your office. You will favor me by examining the field notes and ctf., if any can be found." The Land Commissioner replied in December of the same year: "Replying to your favor of the 5th inst., I beg to state that the space colored red on the enclosed sketch appears vacant according to the records of this office. Sketch will otherwise explain itself. The patent of the Wilson Strickland has not been cancelled."

Since the Wilson Strickland Survey was recognized by the fact that the field notes and patents of both the Trevathan Survey and Sitton Survey above referred to called for the lines of the Wilson Strickland Survey, and bearing in mind what we have heretofore said concerning the Wilson Strickland Survey, it is clear to us that the James Wilson Survey was not a live and valid survey and that it was junior to the survey of the Wilson Strickland, and therefore the contentions of the State, Davis and Williams with reference to the James Wilson Survey must fail and further discussion of it would be of no avail.

We cannot leave the discussion of the above points without saying, absent fraud, that we think justice and common sense demand that the court take into consideration the unsettled condition of the country and the great difficulties that presented themselves in the period covered by the survey, and particularly under consideration here, and we likewise think it pertinent to quote from the opinion of our Supreme Court in Hamilton v. Menifee, 11 Tex. 718, decided by the Supreme Court in 1854, wherein the court was discussing the question raised that the grant was void because it was not made by a surveyor authorized to make same but by a surveyor authorized to survey in an adjoining area. "These discordant surveys show the inherent difficulty in tracing the interior line of the coast leagues, and the danger to which titles would be exposed by fixing, after the lapse of twenty years from the grants, any specific line as the unvarying boundary by which titles must stand or fall. The restriction on colonization within the border and coast leagues was established for political purposes. But no line was traced by either the General or State Governments accurately defining the boundaries of the reservation. Under such circumstances, the line was ascertained in various ways, by the authorities invested with the granting power, in territory adjacent to the boundary; and in conformity to these lines, numerous titles were granted, and rights to lands acquired. It would be an act of great injustice to permit titles fairly and honestly granted, without reference to a line or boundary, not traced by the government, but honestly determined upon by the authorities, on the best lights which they had on the subject, to be now impeached, because they are two or three miles within or without what may now be supposed to be the exact line. Exactness was difficult of attainment and should not be insisted upon, to the destruction of right. * * * On these principles, the title of Buentello must be held good, whether it be a few miles within or without the true boundary. It was supposed by the granting authorities to be without the boundary. No line had been run at the time of the grant, although eight years had elapsed from the Colonization Law."

We think it pertinent to observe here that the land in question had been surveyed and patented for about ninety years before this litigation arose, and it is without dispute that no rights of third parties to the land had intervened from the

time of the making of the survey (1838) until the filing of the suit, and absent fraud, as is the case here, we do not think the patent can be questioned at this late date and that it is against public policy to do so. See Stoddard v. Chambers, 43 U.S. 284, 2 How. 284, 11 L.Ed. 269; Elliott's Adm'r v. Mitchell, 47 Tex. 445. In all events, the Wilson Strickland patent is valid on its face. The rule is "* * * that a patent is not void by reason of irregularity which does not appear upon its face, and that, in the absence of fraud, the judgment of the Commissioner of the General Land Office upon the qualifications of a patentee is conclusive." State v. Sneed, Tex.Civ.App., writ ref., 181 S.W.2d 983, 987, point 2 for collation of authorities. The Strickland patent is legal on its face.

Moreover, if we are mistaken in our view that the land was in Harrisburg District at the time it was surveyed, it is clear that those officials of Harrisburg District and Montgomery County who were dealing with it at that particular time were of the opinion that the land was in Harrisburg District.

The appellees' eleventh counter proposition is: "Even if the land was in Montgomery County at the time the survey was made and even if the survey was invalid because made by a surveyor of the Harrisburg District, this survey and the patent issued thereon were validated by the Legislature of the State of Texas by an Act approved April 16, 1889, General Laws 21st Leg., p. 107, Vol. 9, Gammel's Laws of Texas, p. 1135. This contention must be sustained. We quote sections 2, 3 and 4 of the Act:

"Sec. 2. That all surveys heretofore made by any county or district surveyor, which would otherwise be valid, shall not be called in question on account· of said surveys having been made outside of the proper county or district, but said surveys shall be valid the same as if the said surveyor had jurisdiction in the territory embracing the same.

"Sec. 3. The provisions of this act shall not apply to nor affect the rights of third persons heretofore acquired by virtue of any purchase from the State location or surveys made in accordance with the laws in force at the time of such location and survey.

"Sec. 4. Whereas there is much confusion and uncertainty in regard to certain lands surveyed in this State, and the rights of actual settlers and purchasers are dependent upon the validity of such surveys, creates an emergency and imperative public necessity authorizing the suspension of the constitutional rule requiring bills to be read on three several days, and demanding that this act take effect and be in force from and after its passage, and it is so enacted."

We think it is clear that the effect of Section 2 validated the survey made by Carson of the land in controversy, even though the land may have been outside of Carson's district at the time he made the survey. That point is certain unless it can be shown that the rights of some third parties attached to the land prior to the validating act and unless the parties bringing this suit claim under such third parties, and no such condition here exists. It is obvious that the purpose of the validating act of 1889 by the Legislature of Texas was an attempt to see that justice was done and that men would not lose their rights to land simply because of some misunderstanding or uncertainty by reason of some technical provision of the land laws of the Republic and these validating acts have uniformly been upheld by our courts.

The power of our Legislature to pass such validating act is not an open question. Similar validating acts have been upheld uniformly by our courts. "Acts have been passed validating titles issued by the King of Spain, by the government of Mexico and by the state of Texas. Many of the acts validate grants and sales made before the adoption of the constitutional amendment of 1883 (see Article 7, § 4) and many validate sales of school land made * * * after the act of 1900, setting apart the remaining domain to the school fund. The validating acts include grants and sales made to individuals, to cities and towns, to railroads and other corporations, to Confederate veterans and soldiers. Some of the acts validate awards and sales of school lands which awards and sales have been held by the courts to be void." State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065, 1078; Cox v. Houston & T. C. R. Co., 68 Tex. 226, 4 S.W. 455; Duren v. Houston & T. C. R. Co., 86 Tex. 287, 24 S.W. 258; Blum v. Houston & T. C. Ry. Co., 10 Tex.Civ.App. 312, 31 S.W. 526, writ ref. See also Von Rosenberg v. Cuellar, 80 Tex. 249, 16 S.W. 58, and State v.

Powell, 63 Tex.Civ.App. 405, 134 S.W. 746, writ ref.

■ The factual situation presented in the case of State v. Powell, supra, illustrates the length to which our courts have gone to sustain similar validating acts. The opinion in State v. Powell, supra, by the late Associate Justice Rice, is comprehensive and clear, and we think the rule announced in that decision is applicable to the validating act here under consideration, and such rule has been followed by our Supreme Court. See State v. Bradford, supra. But appellants contend in effect that if the Act of 1889 was constitutional that it validated only those surveys which would otherwise be valid and they contend that since the Wilson Strickland Survey was not properly approved by the Traveling Land Board and that since it was not otherwise valid, because the Ransom House, Lemuel Smith and W. C. C. Lynch Surveys were in conflict with a part of it, that such act was without any force and effect with reference to the Wilson Strickland Survey. We cannot agree with either of these contentions. We have already discussed the first one at length and have held that the Wilson Strickland certificate was approved by the Traveling Land Board. It is without dispute that the Ransom House, Lemuel Smith and Lynch Surveys aforesaid were run out subsequent to the surveys made by Carson of the Wilson Strickland. When Carson made the Wilson Strickland Survey, there was no other survey on the ground to interfere with it. The Wilson Strickland was otherwise valid when made. The fact that another surveyor later put in other surveys which conflicted in part with Carson's work did not destroy the fact that the Carson Survey was otherwise valid when made. However, the land in controversy here is not in conflict with any of these Montgomery County Surveys. We are of the opinion and hold that the validating act of 1889 was constitutional and therefore if we were in error in holding that the evidence does conclusively show that the land was in Harrisburg District at the time it was surveyed by Carson, then and in such event the validating act did validate the survey.

■ Finally, we think it was the duty of the trial court to grant appellees' motion for an instructed verdict against the State, Williams and Davis, because of the one-year statute of limitation found under subdivision 4 of Art. 5329, Vernon's Civil Stat-

utes. That part of the statutes applicable to the discussion here reads as follows: "No sale made without condition of settlement shall be questioned by the State or any person after one year from the date of such sale." This statute was first passed by the Legislature, as shown by the Acts of 1907, and was thereafter amended by the Legislature in 1919 and 1921. It has been construed many times by our Supreme Court. In the case of Erp v. Tillman, 103 Tex. 574, 131 S.W. 1057, 1061, in discussing the foregoing statute which applied at that time to persons other than the State and before its amendment to bring the State within its provisions, the court said in part: "It may properly be called a statute of limitation, but it is more than that. In addition to fixing a time for suit, it contains both a rule of substantive law and a rule of evidence which the courts must take notice of and be guided by in the decision of such causes. It ought not to be forgotten, though it often is, that the interests of two contestants over school land which has been sold to one of them, are not the only ones involved. The state has an interest in the maintenance of sales made for the benefit of its school fund, and it was largely to give such protection that this statute was passed. It had been common for sales which had stood for years to be treated as naught and the relations and accounts between the state and its purchasers disturbed by other applicants showing some failure to comply with the law in the making of the sales. It was not so much to protect purchasers who had not complied with the law as it was to prevent such interferences with sales and to reserve to the state the election to abide by or repudiate them, that this statute was adopted. A year was deemed sufficient time in which to allow awards to be put to the tests previously applied at the instance of intending purchasers and lessees, and after which only the state could interfere."

Our Supreme Court in Callahan v. Giles, 137 Tex. 571, 155 S.W.2d 793, 796, adhered to the reason and the rule formerly announced by Justice Williams in the above cause, and in addition thereto said: "The petition must also be refused for another reason. Whatever right relator may have had to attack the sale has been barred by Section 4 of Article 5329, R.C.S. of 1925, which, so far as were pertinent reads: 'No sale made without condition of settlement shall be questioned by the State or any per-

son after one year from the date of such sale.' This Court has repeatedly held that a suit to test the validity of a sale of public lands made by the State must be filed within one year after the date of such sale, and not afterwards." The reason for the effect of the 1921 amendment adding the State to those who were barred within one year from questioning a sale made by the Land Commissioner was pointed out by the Commission of Appeals, opinion adopted· by the Supreme Court, in the case of Herndon v. Robison, 114 Tex. 446, 270 S.W. 159, 160, wherein it said: "* * * it has been settled that the act furnishes not only a rule of limitation, but, in the interest of the state and to the advantage of individuals, a substantive rule of repose, which, after the lapse of the·year, vests, as against all such claimants, a conclusive right in the defending purchaser." See also State v. Sneed, Tex.Civ.App., 181 S.W.2d 983, writ ref., point 2 and for collation of authorities; and Greene v. Robison, 109 Tex. 367, 210 S.W. 498. Since the Wilson Strickland patent is based on a legal certificate which was legally proved up and established under the John S. Black Act, and since the land was duly purchased and the consideration paid (1839) almost one hundred years ago, we are of the opinion that appellant's cause of action is barred by said one-year statute of limitation.

But the appellants also contend substantially that the State should recover the land in question because the record shows that the State had purchased the land at a tax sale from the Assessor and Collector of Taxes of Montgomery County by deed dated June 27, 1848, in payment of taxes alleged to be due for the year 1846 against James Wilson as the owner. On objection of appellees the trial court excluded this deed, but it is shown in the record by Exhibit PS–1139. Appellants' point is based on paragraph XI in their amended motion for new trial which reads: "The court erred in refusing to allow in evidence Exhibit No. PS 1139, being a deed from the Tax Assessor and Collector of Montgomery County to the State of Texas dated in 1848 for taxes owing for the year 1846." We have grave doubts as to whether this assignment is sufficient to point out any error of the court in excluding the deed, if such deed had been admissible. The old rules Nos. 67 and 68 for District and County Courts have been brought forward in the present rules and they are now Rules Nos. 321 and 322 of Texas Rules of Civil Procedure. In this connection see Alexander v. Louisiana & Texas Lbr. Co., Tex.Civ.App., 154 S.W. 235; Harlingen Land & Water Co. v. Houston Motor Co., Tex.Civ.App., 160 S.W. 628; San Antonio U. & G. R. Co. v. Storey, Tex.Civ.App., 172 S.W. 188; Quannah A. & P. R. Co. v. Bone, Tex.Civ.App., 208 S.W. 709; Kronkosky v. Kuhn, Tex.Civ.App., 259 S.W. 1009. See also Rule 374, T.R.C.P., which provides: "A ground of error not distinctly set forth in the motion for new trial, in cases where a motion for new trial is required shall be considered as waived." It is without dispute that the excluded tax deed was never recorded according to law and was never filed with the County Clerk in Montgomery County or in any other county. It appears that the deed was found in the files of the State Library at Austin. The deed was executed at a time when the Act of March 20, 1848, was in force and effect. This act, in our opinion, differs from the Act of 1860 in that the Act of 1848 did not undertake to make the tax deed prima facie evidence of the power of the assessor to make the sale. Our view of the record is that the deed was not proved up and was not of itself admissible in evidence and the power of the assessor to make the sale was not proved. See Terrell v. Martin, 64 Tex. 121; Devine v. McCulloch, 15 Tex. 488; Wright v. Giles, 60 Tex.Civ.App. 550, 129 S.W. 1163; Land v. Banks, Tex.Com. App., 254 S.W. 786. But if we be mistaken in what we have said above, we are of the opinion that the tax deed could be of no avail because as we view the record James Wilson never acquired any title to the land in question. The James Wilson field notes were never returned to the Land Office and no claim was ever made by him to land in Montgomery County. His certificate was floated and satisfied by a grant of land in Fannin County. It follows that if the tax deed had been regular in every respect and had the authority of the Collector and Assessor been shown and all necessary proof made, still the deed would not be admissible in this case and would have no effect upon the title of appellants or appellees because James Wilson had no interest in the land. If James Wilson had executed a deed undertaking to convey the land to the State on June 27, 1848, it would have passed no title. We think the tax sale was void. Terrell v. Martin, 64 Tex. 121; Devine v. McCulloch, 15 Tex. 488;

Land v. Banks, Tex.Com.App., 254 S.W. 786. See also Pitts v. Booth, 15 Tex. 453. It being without dispute that the State never issued a patent to James Wilson, it is fundamental that title never passed from the State to James Wilson to the tract in question. Since plaintiffs' cause of action is a suit in trespass to try title, the burden is on the plaintiffs, who must recover, if at all, on the strength of their own title and not on the weakness of that of defendants. "* * * the rule is well established in this state that in trespass to try title, the strength of the defendant's title is immaterial when it appears that the plaintiff has no right to the land." Nicndorff v. Wood, Tex.Civ.App., 149 S.W.2d 161, 163, writ ref. See also authorities collated under Art. 7375, Vernon's Rev.Ann.Civ.Stats. Since we are of the opinion that the patent in question to the Wilson Strickland Survey was valid, it divested title out of the State; and since said patent has never been canceled, our view is that the State, Davis and Williams have not discharged the burden imposed upon them by law, and for that reason the trial court did not err in instructing a verdict against them. See Producers Oil Co. v. State, Tex.Civ.App., 213 S.W. 349; Mitchell v. Bass, 26 Tex. 372; Miller v. Moss, 65 Tex. 179; 22 Tex. Jur. 67–69; Boswell v. Pannell, 107 Tex. 433, 180 S.W. 593; Byers v. Wallace, 87 Tex. 503, 28 S.W. 1056.

We now pass to a consideration of those errors assigned against the judgment by the other claimants. The fifth point in the brief in behalf of Matthew Strickland et al. is: 'The Vince judgment rendered in August, 1848, in the suit of Allen Vince v. Wilson Strickland was void because the court was without jurisdiction to hear and determine the suit." We overrule this assignment. It is without dispute that in April, 1838, Wilson Strickland and Allen Vince entered into a locative contract, by the terms of which Strickland bound himself to give to Vince a one-half interest in the Wilson Strickland Survey in consideration of his locating same and paying to the State the consideration charged therefor. In August, 1847, Vince filed suit in the District Court of Harris County against Strickland alleging substantially his performance under said contract; that Strickland was not entitled to the league and labor mentioned in said contract but was entitled to only one-third of a league, for which the March 16, 1838, certificate was issued; that Vince had done everything required of him under his contract and thereby became the owner of one-half interest in the one-third league; that thereafter and in 1838 a parol sale and conveyance was made by Strickland to Vince covering the other one-half interest in said one-third league in payment of certain indebtedness owing to Vince by Strickland. Upon the trial of the case to a jury, judgment was entered on the jury verdict for Vince for said one-third of a league. The court also filed findings of fact and conclusions of law in which the court found that Vince owned one-half of the land under the locative contract and owned the other one-half by the sale and conveyance above mentioned, and that therefore the land belonged to said Vince. Vince died in 1849 and in 1850 administration proceedings were instituted on his estate in Fort Bend County and the Wilson Strickland one-third league was inventoried as a part of the property and estate of Vince. In May, 1860, the probate court of Fort Bend County entered an order wherein it found and decreed that Susan Pratt, a sister of Vince, deceased, was his only heir. Susan Pratt died intestate, leaving no children and leaving surviving her husband Thomas Pratt. Thomas Pratt subsequently died, leaving all of his property to Lampasas county. Thereafter the Commissioners' Court of Lampasas County sued W. H. Browning, Executor, et al. in the District Court of Lampasas County and judgment of the court removed said Browning as executor of said estate of Thomas Pratt, deceased, and appointed John Houston as receiver therefor. John Houston, as receiver, pursuant to court order, executed a lease to John M. Seip covering the entire Wilson Strickland one-third of a league, dated November 19, 1932, and recorded November 21, 1932. This 1932 lease and the July 19, 1933, ratification thereof was assigned by Seip to Showers & Moncrief, Inc., and said Showers & Moncrief, Inc., became Mon-Sho Oil Company, one of the appellees herein. On October 19, 1935, Lampasas County, by its receiver (by court order) conveyed all interest to J. E. Carr, trustee, the instruments being recorded on November 5th and 6th 1933. By instrument dated February 27, 1936, John M. Seip conveyed all interest which he had in the Wilson Strickland land to J. E. Carr, trustee, Carr being trustee for the appellees. The property having passed to Susan Pratt

by inheritance, her husband, Thomas Pratt, upon her death, acquired only an undivided one-half interest and the other undivided one-half interest passed to her collateral heirs. The appellees bought in the interests of these various heirs and it is without dispute that the appellees acquired such title to the tract in question as vested in Allen Vince by virtue of the suit he filed in August, 1847.

It is appellants' contentions substantially that since Wilson Strickland was not a resident of the State of Texas at the time suit was filed against him and since service upon him was by publication and since he entered no appearance and filed no answer and no attorney was appointed by the court to represent him and no attachment was issued against his property, that the judgment entered against him was void. We cannot agree with either of these contentions. The judgment collaterally attacked recites in part: "A judgment in this case by default not finally having been entered against the defendant at the last Spring term of this court upon proof that publication against the defendant had been made according to law" imports absolute verity and it must be presumed as a matter of law that the defendant was duly cited. See Smith v. Walker, Tex.Civ.App., 163 S.W.2d 857, writ refused, points 1 and 2 for collation of authorities. That Vince acquired a vested interest by virtue of his performance of the locative contract is not an open question in Texas. Doss v. Slaughter, 53 Tex. 235; Smock v. Tandy, 28 Tex. 130; Gibbons v. Bell, 45 Tex. 417; Reed's Adm'r v. West, 47 Tex. 240. And we are of the further opinion that the entire title passed out of Wilson Strickland into Allen Vince by virtue of the judgment obtained in the District Court of Harris County in 1848. "If a state has no power to bring a nonresident into its courts for any purposes by publication, it is impotent to perfect the titles of real estate within its limits, held by its own citizens; and a cloud cast over such title by a claim of a nonresident will remain for all time a cloud unless such nonresident shall voluntarily come into its courts for the purpose of having it adjudicated. But no such imperfections attend the sovereignty of the state. It has control over property within its limits; and the condition of ownership of real estate therein, whether the owner be stranger or citizen, is subjective to its rules concerning the holding, the

transfer, liability to obligations, private or public, and the modes of establishing titles thereto. It cannot bring the person of a nonresident within its limits,—its process goes not out beyond its borders,—but it may determine the extent of his title to real estate within its limits, and for the purpose of such determination may provide any reasonable methods of imparting notice." Hardy v. Beaty, 84 Tex. 562, 19 S.W. 778, 780, 31 Am.St.Rep. 80. See also Boswell's Lessees v. Otis, 50 U.S. 336, 9 How. 336, 13 L.Ed. 164; Single v. Scott Paper Mfg. Co., C.C., 55 F. 553; Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565; Brown v. Clippinger, 113 Tex. 264, 256 S.W. 254; Carr v. Miller, 58 Tex.Civ.App. 57, 123 S.W. 1158; Crow v. Van Ness, Tex.Civ.App., 232 S.W. 539; Flack v. Braman, 45 Tex.Civ.App. 473, 101 S.W. 537; Letney v. Marshall, 79 Tex. 513, 15 S.W. 586; Levy v. Roper, 113 Tex. 356, 256 S.W. 251; Treadway v. Eastburn, 57 Tex. 209.

The first point in the brief of appellants, Matthew Strickland et al., is: "The undisputed evidence established the fact that the juror Murdock, who was excused by the Court, was guilty of misconduct, which disqualified him from further service on the jury and it was error for the court to excuse this juror for misconduct and proceed with the trial with the remaining eleven jurors."

Substantially the same point is urged by each of the other family groups appealing.

The record shows that the court had reprimanded the juror Murdock in November, 1940, while the case was being tried, because the juror was found with Ed Porterfield, one of the litigants of the Porterfield group. On May 8, 1941, one of the attorneys for the Porterfield group privately reported to the court that Murdock, during the Christmas recess of 1940, went to Atlanta, Georgia, where the Porterfields lived, and visited with them. On the morning of May 9, 1941, before court convened, the court sent for the juror and interrogated him about what the court had heard. No one was present but the judge, the court reporter and the juror. The court reporter took shorthand notes of this private conversation between the court and the juror and these notes were adduced in full on the motion for new trial. The court, after interrogating Murdock at length about his trip, became convinced that the juror was disqualified from further service; and because all parties are in agreement that said

juror was disqualified by reason of his conduct, it would serve no useful purpose to recite these facts in detail. However, we quote in question and answer form the conversation between the court and Murdock which is pertinent to the point raised by appellants.

"Q. (The court) You know this kind of stuff, we just can't put up with it. We have spent a lot of money and a lot of time on this case. I can't go on and try the case with you on the jury. A. (Murdock) All right, I know that.

"Q. I am going to ask you to go in there this morning and request to be excused in the presence of the court, that your foot hurts you and that you are old and that you would like to be excused; are you willing to do that? A. Yes, sir; I would have done that before if I thought I could have gotten off; I am getting tired of it.

"Q. I don't know, I am scared of you, you started off this morning lying to me. A. Yes, I didn't want to come out with the whole business. I didn't lie, I just didn't go far enough with you.

"Q. I don't want you to be talking with the other jurors and I don't want you to be talking on the streets about this case; it just depends on how you conduct yourself from here on out as to how I treat you. I can hold you in contempt. I don't want to fine you now and I don't want to put you in jail. Is there any place you can go? A. I am leaving town tomorrow.

"Q. I don't want you to go back to Georgia. A. Yes, sir.

"Q. When I call Court, you get up and make a pretty nice little request for me to excuse you, and then after this case is over, I want to talk to you. You have put me in an awful embarrassing position. I can't go on with the case with you on the jury, and when I get you off, I do not know whether the case will stand up or not. If I hear anything you say about this case, you are going to make me get right on you. A.. You are not going to hear anything. I am not going to be around here."

When court convened on May 9th, following the conference between Judge Murphey and Murdock, the following proceedings were had:

"May 9, 1941. Morning Session. At this time the jury was brought into the jury box.

"The Court: Let's come to order.

"Mr. J. R. Murdock: Your Honor, as you all know, I fell down the steps several days ago and I am just hardly able to go. I have been going along and along and it doesn't seem to me to be getting any better, the foot has gotten so it pains me so that I can't rest at night, and I want to go somewhere where I can get it straightened out, and if there is any way in the world that you can excuse me, I wish you would, so I can get some medical treatment.

"The Court: How old are you?

"Mr. Murdock: Seventy-four the first of March.

"The Court: You don't feel like you can go ahead?

"Mr. Murdock: I don't feel like I can go on another week; the doctor told me he thought it was rheumatism and advised me to go to Hot Springs.

"The Court: Under the statute, where one of the jurors or more than one are disabled, it is discretionary with the Court to excuse them and continue with the case.

"The Court: Mr. Murdock, I am going to excuse you and let you go ahead and be treated.

"Mr. Murdock: I certainly thank you.

"Mr. Campbell (attorney of record): And let the record show there is no objection to the dismissal, that it is agreeable to all parties to the case.

"Mr. Cone: Just a moment, if it please the court, before we put that in the record.

"The Court: All right.

"The Court: Go ahead, Mr. Murdock."

Whereupon Mr. Cone and two of his associates had a conference out of the hearing and presence of the court and thereafter returned into the courtroom.

"The Court: All right, gentlemen, we are ready to proceed."

On motion for new trial Murdock testified substantially to the effect that on the morning he was excused he was suffering pain; that he had fallen on the courthouse steps some ten days before; that Judge Murphey and Bill Martin (bailiff) saw him fall and that Judge Murphey took hold of his arm and assisted him; that he consulted a physician after his fall; that he saw the physician the afternoon before he was discharged; that his physician advised him to take a rest and stay off his foot; that from the time that he had fallen and the time he made the request of the

court to excuse him, his foot was still paining him and that his ankle was swollen and he couldn't put his heel on the floor and had to walk on his toes; that he had definitely made up his mind to ask the court that afternoon to be excused because his physician had advised him to stay off of his foot. Murdock's fall and injuries are not in dispute.

Each of the other eleven jurors testified without dispute that while some of them knew that Murdock had made a trip to Georgia during the Christmas holidays, Murdock made no mention to them concerning his contact with the Porterfields, nor concerning any information which he learned as a result of such contact.

On the motion for new trial the court made the following statement: "I will state this to you, the first I knew about it was about recess time the day before it happened. Mr. DeLange (one of the attorneys for the Porterfields) told me he wanted to see me, and he told me the whole story, just about like it had been told here. That was my first knowledge of Mr. Murdock having gone to Georgia and visiting with the Porterfields, and it was Mr. DeLange's idea that inasmuch as the other jurors had not been exposed to this, that we would see if we could work it out so all of the lawyers would be informed and still the jury not know about it, and after thinking about it most of the night I felt if we had a meeting, it would give it a lot of publicity, and I felt under the statutes I had the authority and I took the responsibility, and I do not believe I mentioned it to anybody, but called Mr. Murdock in and had this conversation with him and came back and excused him because I thought I had the authority to do it."

The judgment, among other things, recites: "And the term of this court in which said trial commenced having been duly and regularly extended from time to time by orders duly, regularly and legally entered, all with the consent and agreement of all parties involved, the trial continued from day to day before said duly impanelled jury to twelve lawful jurors until the 9th day of May, 1941, on which day juror J. R. Murdock, in open court, announced unto the court and to the parties and attorneys during said trial, that he had suffered an injury and could no longer sit in the cause as a juror and asked to be excused from further service;

whereupon on questioning by the court, it was shown that said juror Murdock was seventy-four years of age, had suffered an injury and was disabled from continuing as a juror in the case, and had been ordered by his physician to go away for a rest; whereupon the court, with the agreement and approval of counsel, excused said juror Murdock from further service, and the cause continued from day to day with the remaining eleven jurors serving as such."

The order overruling motion for new trial, among other things, states:

"(11) All attorneys for all parties in attendance upon the court were advised of all the facts and circumstances of the juror Murdock's injury and other matters surrounding his discharge from the jury prior to the discharge of said juror Murdock and all of said attorneys agreed to his discharge from further jury service; that such attorneys as were not in regular attendance on the court were advised of said matters long prior to the submission of the case to the jury of the 11 remaining jurors and long prior to the return of the jury's verdict herein and all attorneys and parties herein agreed to continue the trial with the remaining 11 jurors and made no objection of any kind until long after the jury of 11 men had returned its verdict herein duly and regularly signed by each of the said 11 jurors and until long after the reading and an examination of the verdict of said jury by attorneys for the various groups of plaintiffs, cross-plaintiffs and intervenors herein showing that the jury had found against each of said groups of plaintiffs, cross-plaintiffs and intervenors now complaining of alleged jury misconduct and of the verdict as being returned by 11 men instead of 12 jurors;

"(12) The court further finds that no plaintiff, cross-plaintiff, intervenor nor defendant was in anywise prejudiced, damaged nor injured by the indiscretion of the juror J. R. Murdock, nor by his being discharged from the jury, nor by continuing the trial with 11 jurors, nor by the fact that the verdict of the jury was by 11 jurors rather than 12."

Our view is that the record indisputably sustains these findings. We think the factual situation here presented is analogous to and is controlled by the rule announced in Routledge v. Elmendorf, 54

Tex.Civ.App. 174, 116 S.W. 156, 160, writ ref., wherein the court said: "It appears * * * that during the course of the trial one of the jurors failed to put in his appearance at the hour to which the court had adjourned, but after some minutes came in an intoxicated condition, although he stated he would be sober in five minutes, and would be sober next morning. Appellant sought to postpone the trial until the following day to allow the juror to become sober, but the court discharged the juror, and proceeded with the trial with a jury of 11 men. In his qualification of the bill of exceptions the court stated 'that it was evident that the juror was very drunk, and when questioned did not seem to have any idea of the issues involved in this suit; and, in my judgment, was wholly disabled from sitting in the case.' It is provided in article 3229, R.St.1895 [Vernon's Ann.Civ. St. Art. 2204] following the Constitution, that where, pending the trial of any case in the district court, 1 or more of the jurors, not exceeding three, may die or be disabled from sitting, the remainder of the jury shall have power to render the verdict. The question of disability must necessarily rest in the judgment and discretion of the trial judge; and, unless it should appear that there has been an abuse of such discretion, an appellate court will not disturb his action in the premises." See also: Sunset Wood Co. v. Broadnax, Tex.Civ.App., 136 S.W. 487, writ ref.; Marvin Drug Co. v. Couch, Tex.Civ.App., 134 S.W.2d 356, points 7-9.

■ But appellants contend substantially that since the record shows that the discharge of Murdock from the jury was due to Murdock's misconduct and not to his physical disability and since they were not present at the conference between the court and Murdock and did not know that Murdock's discharge from the jury was because of his misconduct rather than his physical disability, they are entitled to a new trial because under the factual situation presented it was the court's duty to declare a mistrial, and he had no authority to do otherwise. The fallacy in appellants' position is that at the time the court excused Murdock, they had information as to Murdock's misconduct and they agreed that he was disqualified to serve longer and they were willing to proceed with the trial and they made no objection to his discharge, nor to the recitation in the record that they agreed to it. When the court excused Murdock, counsel for one group said: "And let the court record show there is no objection to the dismissal, that it is agreeable to all parties to the case." Counsel for another group said: "Just a moment, if it please the court, before we put that in the record.". The court granted this request, and after counsel had an opportunity to confer with his associates out of the hearing and presence of the court, counsel came back into the courtroom and walked up to the court bench and one of the counsel for appellees asked: "Are you objecting or excepting to the action of the court"; and one of counsel for appellants (the one who made the request) said: "No, I am not objecting or excepting, I am simply standing mute." His associates said nothing. If counsel present desired to object to the action of the court, it was their duty to do so then or forever hold their peace. At the time the court excused Murdock, he was acting under the assumption that the attorneys present knew of the misconduct of Murdock and his disqualification, and the record shows that they did. Moreover, the court found "that such attorneys as were not in regular attendance on the court were advised of said matters long prior to the submission of the case to the jury and * * * long prior to the return of the jury's verdict and all attorneys and parties herein agreed to continue the trial with the remaining eleven jurors and made no objection of any kind until long after the jury of eleven men had returned its verdict * * *" and the record indisputably supports such finding.

■ Did the court exceed his authority or abuse his discretion in excusing Murdock? We think not. All agree that Murdock was disqualified from further service. Did the court act in bad faith or to the injury of appellants in discharging Murdock for physical disability, when in fact the motivating cause of the court's action was the misconduct of Murdock rather than his physical disability? Under the factual situation presented, we think not. The trial judge was exerting his best efforts to keep the misconduct of Murdock from the other members of the jury and thereby enable him to proceed with the trial. No effort was made by the court or anyone else to conceal the misconduct

116

of Murdock from any of the attorneys representing any of the parties. The trial began on August 26, 1940, and continued until May 9, 1941, at which time the court excused Murdock. Thereafter the trial continued (without protest) until May 29, 1941, when all parties rested. The court began reading his charge on June 30, 1941, and ended on July 2, 1941; argument began the same day and ended on July 31, 1941; and the jury returned its verdict on August 2, 1941. Our view is that appellants waived their right to complain of the discharge of Murdock and the further procedure of this cause to trial with the eleven jurors. None of the attorneys testified on the motion for rehearing that they did not know about Murdock's misconduct prior to the time the cause was submitted to the jury. Therefore, we hold that all parties are precluded from complaining of the action of the court because they gambled that the verdict of the eleven jurors would be favorable to them. Moreover, the evidence adduced on motion for new trial is without dispute that Murdock's misconduct was not known to the other jurors and his discharge in nowise influenced the jury in its verdict, nor is there any evidence of any misconduct of the remaining eleven jurors.

The new rules became effective September 1, 1941; however, our view is that the action of the court in excusing Murdock and proceeding with this cause to trial and completion was not error under either the old rules or the new. (As to distinction under old and new rules as to jury misconduct, see Sproles Motor Freight Lines, Inc. v. Long, 140 Tex. 494, 168 S.W.2d 642; Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462.)

We have carefully considered each of the other errors assigned by all appealing parties not herein discussed and each is overruled. It is our view that the judgment entered by the trial court in favor of the appellees who are without dispute in possession of the land in controversy should be in all things affirmed, and it is so ordered.

The clerk is directed to tax the costs in each appeal herein disposed of against the respective appellants therein named, save and except the nonresident defendants therein named cited by publication and the unknown heirs of such defendants.